**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

ROLIN CONSTRUCTION, INC.,                :

    Plaintiff,                                          :

vs.                                                        :       CA 18-0032-MU

WIND CLAN CONSTRUCTION                 :
COMPANY, INC.,
                                                              :
    Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter came on for a bench trial before the undersigned on October 30-November 1, 2019. Upon consideration of the agreed facts set forth by the parties in their revised final pretrial document (*see* Doc. 59, at 2, 3 & 5), the testimony offered by the witnesses during the bench trial, the exhibits admitted without objection (*see* T.T. 27-28 & 719; *compare id. with* Doc. 70 (Defendant's submission of additional trial exhibits)), and deposition excerpts admitted without objection (T.T. 308 (admission of Plaintiff's Exhibits 125 & 126 (Curtis Dorsey, Tara Peaden deposition excerpts); *compare* T.T. 872 (defense counsel's reminder to the court that he would submit deposition excerpts) *with* Doc. 70, Attached Deposition Excerpts of Kenneth ("Bear") Dorsey and James Babin)), the Court enters this memorandum opinion and order pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73, and S.D. Ala. GenLR 73(c) & (d).

## **FINDINGS OF FACT**

Plaintiff Rolin Construction, Inc. ("Rolin") is a general contractor who secured a contract with the Poarch Band of Creek Indians to construct a Child and Youth Development Center ("CYDC") on tribal lands in Atmore, Alabama. (*Compare* T. T. 32 & 34-35 *with* Plaintiff's Trial Exhibit 5 (contract between Rolin and the Poarch Band of Creek Indians)).[1] Wind Clan Construction Company, Inc. ("Wind Clan"), a Florida-based subcontractor, entered into a subcontract with Rolin, on February 13, 2017, to perform the interior and exterior framing work on the CYDC project. (*Compare* T.T. 36 & 37 ("Wind Clan had all exterior metal stud framing; external sheathing; the vapor barrier on the building; the exterior Hardie system [i.e., fiber cement siding]; all interior framing; drywall; finishing; acoustical ceilings; and sound acoustical panels.") *with* Plaintiff's Trial Exhibit 32 (subcontract agreement and rider to subcontract agreement executed by Wind Clan on February 13, 2017)).[2] The negotiated subcontract agreement (T.T. 337), with agreed-upon changes contained in the rider (T.T. 47-48, Plaintiff's Trial Exhibit 32)), reads, in relevant measure, as follows:

> **Article One: SCOPE OF WORK**
>
> The work to be performed by SUBCONTRACTOR under the terms of this agreement consist of furnishing all supervision, labor, materials, tools, implements, equipment, permits, fees, lifting and hoisting devices, scaffolding, etc. to do all of the work identified in the Scope of Work attached to this agreement as "Attachment A". The work to be performed by SUBCONTRACTOR includes the work specifically set forth in Attachment A to this agreement, all Drawings, Specifications, Addendums,

---

[1]   Hartford Fire Insurance Company ("Hartford") was Rolin's surety for the project.

[2]   The Tribal Employment Rights Ordinance ("TERO") granted advantages to tribal-member-owned businesses/contractors, like Rolin and Wind Clan, with respect to "employment with the tribe or construction projects within the tribe or providing projects to the tribe." (T.T. 38; *see also* T.T. 483).

Case 1:18-cv-00032-MU   Document 76   Filed 04/24/20   Page 3 of 67   PageID #: 1423

Special Requirements, [] as well as any and all other work reasonably inferable from the Contract Documents, including this Subcontract Agreement (the "work").

.     .     .

**Article Three:  PROSECUTION OF WORK**

Time is of the essence for this Subcontract Agreement. SUBCONTRACTOR agrees to begin its Work when notified by the CONTRACTOR and will carry forward and complete its Work as rapidly as the CONTRACTOR may judge that the progress of the Work will permit, and so that SUBCONTRACTOR's Work will not cause delay in the progress of OWNER's or CONTRACTOR's Work or other parts of the work carried on by other subcontractors, and so that CONTRACTOR's Work can be completed with[in] the time period required by the Prime Contract. SUBCONTRACTOR agrees that development of the schedule for construction[,] including the assignment of the duration of various portions of SUBCONTRACTOR's Work, shall be done as CONTRACTOR may determine. CONTRACTOR may, from time to time, provide written and/or verbal instructions to SUBCONTRACTOR conveying the requirements of the schedule. CONTRACTOR may, from time to time, modify the required duration, sequencing, phasing or other scheduling requirements of the Project as required to meet the time requirements of the Prime Contract. SUBCONTRACTOR recognizes that changes will be made in the schedule and agrees to perform its Work as set forth in any such schedule as it may be modified from time to time, and agrees that the Subcontract price provided in Article 4 below includes all costs for such contingencies. At the request of CONTRACTOR, SUBCONTRACTOR shall provide a schedule of its work under this Subcontract showing timely completion and shall be diligent in executing his/her work to ensure performance of the work at a level acceptable to CONTRACTOR and/or OWNER.

.     .     .

SUBCONTRACTOR shall be liable to CONTRACTOR for any and all actual damages incurred by the CONTRACTOR as a result of the SUBCONTRACTOR's default or breach of any provision of this Subcontract, including, but not limited to, actual damages caused by SUBCONTRACTOR's delay. Actual damages shall include, but not be limited to, any liquidated damages, litigation expenses and attorney's fees, incurred by the CONTRACTOR as a result of SUBCONTRACTOR's default, breach or delay.

**Article Four: PAYMENT**

In consideration of the complete and timely performance of all work under this Subcontract Agreement, CONTRACTOR shall pay to SUBCONTRACTOR the sum of:

**Two Million Ninety Eight Thousand Two Hundred Seventy Seven & 00/100 ($2,098,277)[3]**

.        .        .

Payment shall be made as stated above as the work progresses unless SUBCONTRACTOR is in default. . . . If Subcontractor owes any money to the Contractor as a result of any other project, Contractor has the option, but not the obligation, to deduct the amount owed as a result of these other projects from monies which are owed or are to become owed to the Subcontractor on this project.

.        .        .

In the event SUBCONTRACTOR declines to endorse any check made payable jointly to SUBCONTRACTOR and any of his subcontractors or suppliers, CONTRACTOR may make payment directly to the subcontractor o*r* supplier to whom CONTRACTOR has determined payment is owed by SUBCONTRACTOR. Any direct payment *. . .* will be back-charged to SUBCONTRACTOR.

.        .        .

**Article Ten:  TERMINATION**

If SUBCONTRACTOR at any time shall refuse or neglect to supply sufficient, properly skilled workers, or materials, or equipment of the proper quality and quantity, or fail in any respect to prosecute the work with promptness and diligence or to maintain the schedule of work, or cause by any action or omission the stoppage or interference of work of CONTRACTOR or any other subcontractor or fail in the performance of any of the covenants contained in this Subcontract Agreement, or be unable to meet its debts as they mature, CONTRACTOR may at its option and at any time after serving 48 hour[s] notice of such default, ***and should SUBCONTRACTOR not cure such default within 48 hours,***

---

[3]        This contract was a lump sum contract and when a subcontractor enters into a lump sum contract, it assumes the risk of not being able to do the job for the agreed contract price. (T.T. 848).

***CONTRACTOR may***[4] terminate this Subcontract Agreement by delivering written notice of termination to SUBCONTRACTOR. Thereafter, CONTRACTOR may take possession of the plant and work, materials, tools, appliances, and equipment of SUBCONTRACTOR at the ***project*** site, and through itself or others provide labor, equipment and materials to prosecute SUBCONTRACTOR's work on such terms and conditions as shall be deemed necessary, and shall deduct the cost thereof, including all charges, expenses, losses, costs, damages, and attorney's fees incurred as a result of SUBCONTRACTOR's failure to perform from any money due or thereafter to become due to SUBCONTRACTOR. If CONTRACTOR so terminates this Subcontract Agreement, SUBCONTRACTOR shall not be entitled to any further payment under this agreement until SUBCONTRACTOR's work has been completed and accepted by OWNER and payment has been received by CONTRACTOR from OWNER with respect thereto. In the event that the unpaid balance due exceeds CONTRACTOR's cost of completion, the difference shall be paid to the SUBCONTRACTOR; but if such expense exceeds the balance due, SUBCONTRACTOR agrees to promptly pay the difference to the CONTRACTOR.

CONTRACTOR may, at any time, by written notice to SUBCONTRACTOR, terminate (without prejudice to any other right or remedy of CONTRACTOR) the whole or any portion of this Subcontract without cause whenever CONTRACTOR determines that such termination is in the best interests of CONTRACTOR and/or OWNER looking to the integrity of the overall project. Any such termination shall be affected by delivery to SUBCONTRACTOR of a Notice of Termination for Convenience, specifying the extent to which the performance of the work under the Subcontract is terminated, and the date upon which such termination becomes effective. Unless otherwise stated in the Notice of Termination for Convenience, SUBCONTRACTOR will cease all on-site construction, if any, with regard to the portion (or all as the case may be) of the Subcontract that is terminated, upon the receipt of such written notice. SUBTRACTOR shall (1) cause such steps to be taken as necessary to protect the Work in place, material, and equipment; (2) assign such of its purchase orders to CONTRACTOR as CONTRACTOR may direct; (3) notify all subcontractors of the order to stop operations and cancel or assign such sub[-]subcontracts to CONTRACTOR as directed by CONTRACTOR; (4) cooperate in every way to minimize the cost to CONTRACTOR in stopping and securing the Work or transferring said Work and documentation to another subcontractor if so directed by CONTRACTOR; (5) transfer title to all work, services, uncompleted work, supplies, or any other material produced or services performed or

---

[4] This language is highlighted only to show the parties agreed to a change to the language in the Rider to the Subcontract Agreement.

acquired for the Work terminated as CONTRACTOR may direct; (6) transfer any plans, drawing[s], information and the like (completed or not) as CONTRACTOR may direct; and (7) complete performance of any Work not terminated.

If CONTRACTOR terminates the whole or any portion of this Subcontract Agreement for convenience, SUBCONTRACTOR will be compensated only for the acceptable Work performed to the date of termination as a percent of all of the Work required by this Subcontract multiplied by the Subcontract price specified in Article 4 above, less any payments therefore made to SUBCONTRACTOR by CONTRACTOR on account thereof and less any other amounts chargeable to the SUBCONTRACTOR pursuant to this Subcontract. SUBCONTRACTOR acknowledges, however, that no payment, partial or final shall be due or owed to the SUBCONTRACTOR from CONTRACTOR or CONTRACTOR's surety unless and until, as a condition precedent, CONTRACTOR receives payment for SUBCONTRACTOR's Work from the Owner. In no event shall the total sums paid to SUBCONTRACTOR exceed the Subcontract price.

In the event any exercise by CONTRACTOR of its remedies under this Subcontract Agreement shall be determined to have been wrongful, such exercise shall be deemed a termination for the convenience of the CONTRACTOR under this Article.

(Plaintiff's Trial Exhibit 32).

Baseline Consultants generated its first iteration of the CYDC construction schedule (*see* Plaintiff's Trial Exhibit 2) on October 11, 2016. This version of the schedule showed Rolin broke ground during the last quarter of 2016. The project thereafter suffered rain delays, particularly during December and the first week in January (*compare* Plaintiff's Trial Exhibit 3 *with* Defendant's Trial Exhibit 146), and delays due to owner issues (*see* Doc. 70, Deposition of James "Todd" Babin, at 8-9). By the time Baseline generated its next version, a January 25, 2017 Schedule, foundational construction was underway. (*Compare* T.T. 66-67 *with* Plaintiff's Trial Exhibit 3). Based on testimony from Rolin's crew on the ground at the site, the CYDC "job was a tough job," (Deposition of James "Todd" Babin, at 34), and according to Tony Wright, the

CYDC building was the most complicated building he had ever encountered. (T.T. 616-17; *see also* T.T. 171 & 624 (testimony that the project as a whole and the mockup, in particular, was different and difficult because of the 149-mile-per-hour wind load requirement)).

Wind Clan mobilized onsite to start work on the mockup wall, a standalone model of the exterior and interior of the building, during the week of January 16, 2017 (*compare* T.T. 68, 71 & 248 *with* Plaintiff's Trial Exhibit 23). Construction could not begin on the exterior wall until the architect approved the mockup, and Wind Clan experienced numerous quality control issues with the mockup wall from the early stages. (T.T. 249; *see also* T.T. 249-51). Baseline's January 25, 2017 schedule called for Wind Clan to begin the exterior metal stud work on February 23, 2017, with a completion date for that work of March 15, 2017 (*compare* T.T. 68 & 165 *with* Plaintiff's Trial Exhibit 3). Wind Clan experienced delays and failures on the delivery of correct materials (*see* Plaintiff's Trial Exhibit 63), which prevented timely exterior metal stud work (*see* Plaintiff's Trial Exhibit 35).

Wind Clan also experienced supervision issues on the CYDC project. Andy Reinhart was not ready to be project manager of the CYDC metal stud project (*see* Plaintiff's Trial Exhibit 126, Deposition of Tara Peaden, at 53 & 56; *compare id. with* T.T. 345 & 348 (Cliff Dorsey's testimony that Reinhart could do the job with the support of TK)) and only ended up in that spot because Wind Clan prioritized the OWA project over the CYDC project (*see* Peaden depo., at 59; *compare id. with* T.T. 514-15 (Stephanie Rolin's testimony that Peaden communicated to her that Wind Clan was stretched too thin because of the OWA project)). And while there is evidence in the

record that Rolin's superintendent, Todd Babin, at times improperly ignored Wind Clan

managers and micromanaged Wind Clan's workers (*see* T.T. 393-94, 420 & 594)),

which led to construction mistakes (*see, e.g., id.* at 594-97 (without speaking with the

window subcontractor, Babin directed Wind Clan employees to install window framing

that was too large for the windows)), the evidence also reflects that Babin took these

steps because the supervisors Wind Clan had on the job were not instructing the

laborers how to perform tasks correctly (*compare id.* at 197-98 & 234 *with* T.T. 594 ("But

what [are] you supposed to do if you have Wind Clan employees coming to ask you

what to do with no supervision on the job?")).

On March 1, 2017, Kreutz sent an email to Cliff and Curt Dorsey advising that he

had gotten an "ear full" and though he was not sure how much of the information was

accurate, he stressed that Wind Clan needed "to figure it out[.]" (Plaintiff's Trial Exhibit

37).

> [1]  (2) walls were erected and the windows were missing so studs
> are having to be torn down for the windows?
> [2]  There is not enough material on site to keep moving with the
> exterior walls? Clips are missing?
> [3]  Studs were put in backwards?
>
> Let us know how much of this is accurate ASAP[.] If we get put on notice,
> that will decimate our bonding ability and of course our reputation as a
> company.

(*Id.*). On March 6, 2017, Smith sent to Wind Clan, in care of Cliff Dorsey, a self-

described notice to default "for quality deficiencies and failure to meet schedule" on the

CYDC project, that was also described as a "Notice to Cure" and request to cure the

default (Plaintiff's Trial Exhibit 23; *compare id. with* T.T. 246-47 & Plaintiff's Trial Exhibit

116 (on March 4, 2017, the architect's onsite employee, Steve Dodds, referenced and

observed the need to cure rework on exterior stud clips in the Section G classroom and, on March 6, 2017, observed that the identified deficiency was being addressed/reworked)). Smith listed numerous scheduling dates that Wind Clan would not be able to meet in Section G because of material delays and quality control issues impacting metal stud work, exterior sheathing, and interior metal framing. Smith asked that Wind Clan provide him with a plan of action—within 48 hours—with respect to the need for supplying sufficient manpower—that is, individuals with metal stud experience—and addressing quality control issues. (*See* Plaintiff's Trial Exhibit 23, at 2).[5] Although the notice of default set out a cure date of March 8, 2017, the two sides met on March 7, 2017 and agreed that Wind Clan would have until March 10, 2017 "to correct schedule failures." (*Compare* Plaintiff's Trial Exhibit 38 *with* T.T. 80-81). The last sentence of Rolin's March 7, 2017 "Final Good Faith Notice" reads, as follows: "Wind Clan agreed that if [it] failed to staff the project and complete the work per scheduled dates, Rolin Construction could proceed with [the] default process per the Subcontract Agreement." (Plaintiff's Trial Exhibit 38, at 2).

On March 8, 2017, after receiving Wind Clan's March 8, 2017 email response to Rolin's March 6 Notice and March 7 letter (*see* Plaintiff's Trial Exhibit 39 (Cliff Dorsey objected to any characterization of Wind Clan being in default, as March 15 was the deadline for completion of the work at issue; advised that Wind Clan had a crew coming from the OWA project on March 9, 2017 to assist; it would start working 12 hour days to ensure compliance with the schedule; and it was considering bringing in another

---

[5]     That same date (March 6, 2016), Wind Clan submitted Pay Application No. 1 in the amount of $85,500.00 to Rolin. (*Compare* Plaintiff's Trial Exhibits 110 & 117 *with* T.T. 77-78 & 81). Rolin received payment from the owner on this pay app on May 3, 2017. (T.T. 78).

potential labor provider but discouraged Smith from replacing Dan Cooper or Andy Reinhart)), Seth Smith sent Wind Clan a Notice of Quality Deficiencies (this was "entitled" a "Notice to Cure") regarding the mockup wall. (Plaintiff's Trial Exhibit 40, at 2 (setting forth numerous problems with the mockup wall, including use of wrong materials, poor workmanship, not following the contract documents and RFIs,[6] improper fastening; this notice informed Wind Clan that per the Owner and Architect, the mockup wall needed to be stripped back to the air barrier and the Hardie/insulation system installed per the contract documents); *see also* T.T. 83-85)).

On March 13, 2017, Seth Smith emailed Cliff Dorsey that Rolin was removing Wind Clan's Dan Cooper from the project and advised Dorsey that Andy Reinhart would be allowed to remain as Project Manager so long as he conducted all activity remotely. (Plaintiff's Trial Exhibit 41). Rolin also requested the following items from Wind Clan: "Revised Construction Schedule for Wind Clan's scope of work[;] Load schedule with expected Manpower requirements[;] Schedule for Mock Up Wall[; and] Material Log for project by section or area—Show delivery dates in Schedule[.]" (*Id.*). So, while Wind Clan had not cured the previous problems enumerated, Rolin believed it was "trying to make adjustments to get back on schedule[]" (T.T. 87) and, therefore, Smith's March 13, 2017 email was sent in an effort to "work with Wind Clan to come up with a recovery schedule" that Rolin could look at and work with (*see* T.T. 86-88). Wind Clan's Thomas Kreutz emailed an updated Wind Clan CYDC schedule to Seth Smith and Pat Newman on March 16, 2017 (Plaintiff's Trial Exhibit 64), same reflecting a final completion date

---

[6]     An RFI is a request for information, a mechanism by which a contractor or subcontractor can clarify an issue related to drawings, etc. (T.T. 83). On this project, Wind Clan sent in a number of RFIs. (*See* Defendant's Trial Exhibits 123A-E, 135-41, 155, 162 & 169-71).

for all of Wind Clan's work to be August 1, 2017 (*see id.* at 2; *compare id. with* T.T. 90 (Smith's testimony that Wind Clan did not complete its work by August 1, 2017)). Smith testified that Rolin took this schedule and, after negotiating the sequence with Kreutz and Wind Clan (*compare* Plaintiff's Trial Exhibit 64 (the Wind Clan schedule provided by Kreutz shows Section E being paired with Sections A & B at the tail end of the project) *with* T.T. 90-91 (Smith's testimony that though Wind Clan wanted E to be paired with A & B, Rolin could not accommodate that request and placed Section E back in Phase I)), incorporated that schedule into the April 5, 2017 overall project schedule. (T.T. 90).

Before the April 5, 2017 schedule was issued, Seth Smith sent a March 23, 2017 email to a number of Wind Clan individuals, including Cliff and Curt Dorsey and Kreutz regarding the exterior walls. (Plaintiff's Trial Exhibit 43).

> We have to finish the exterior walls—[w]e have many areas started but almost none finished. The critical path runs through the exterior walls.[7] Please have your staff focus on the exterior walls, sheathing, and waterproofing.
>
> Roofer is mobilizing next week. If a re-mobilization change occurs it will be the sole expense of Wind Clan Construction.

(*Id.* (footnote added); *see* T.T. 252-53 & Plaintiff's Trial Exhibit 45 (in an attempt to help Wind Clan execute its work, the architect provided to the subcontractor, on March 23, 2017, some point-by-point notes and attached pages "for installation instruction for

---

[7] During this March timeframe, the exterior Hardie was not on the critical path (T.T. 174; *compare id. with* Babin depo., at 20 & 22 (on neither the October 11, 2016 schedule nor the January 25, 2017 schedule was the Hardie installation on the critical path)); however, according to Smith, and as reflected in the contemporaneous email generated on April 5, 2017, the exterior framing was on the critical path (*id.; see also* T.T. 555-56 (general knowledge in the construction industry regarding sequencing of a job involving the building of a new building that structural steel and metal studs –the exterior wall—are on the critical path); T.T. 578-79 (when Wright came on the job in March, the critical path he was following involved the exterior studs, exterior sheathing and waterproofing)).

gypsum/framing requirements")). The following day, March 24, 2017, Smith forwarded

to a number of principals at Wind Clan a field observation report regarding the

multipurpose building. (Plaintiff's Trial Exhibit 45, at 1 (the architect telling Wind Clan,

for instance, that the "[i]nterior framing at intersection must install framing behind

gypsum wallboard per manufacturer's recommendations and architectural drawings[,]"

such that there was a need to provide adequate support for gypsum wallboard)).[8]

Wind Clan at this point believed there was an agreement that Section E was to

be bumped behind Sections A & B because Section E was not on the critical path. (*See*

Plaintiff's Trial Exhibit 54).  And while Smith agreed in principle with this state of the

negotiations, he notified Kreutz and Reinhart at 11:16 a.m. on March 30, 2017, that he

was working on the schedule change with Rolin's Todd Babin and would have it

"resolved this week." (*Id.; but cf.* Babin depo., at 29 (Babin could not recall speaking

with Smith about the resequencing)). In a response 58 seconds later, Kreutz wrote: "Let

me know as I would need to revise the schedule for our men. It shows dates for

ordering material, manpower, etc." (*Id.*).

The April 5, 2017 CYDC construction schedule generated by Baseline reflects an

August 30, 2017 finish date for the entire project. (Plaintiff's Trial Exhibit 122). A Wind

---

[8]         On March 27, 2017, Wind Clan submitted its second pay application to Rolin in
the amount of $65,700.00. (*Compare* Plaintiff's Trial Exhibit 118 *with* T.T. 94). Rolin included it
in its March billing to the owner and received payment on May 3, 2017. (T.T. 94).

It is clear that with respect to the first two Wind Clan pay applications (totaling $151,200)
and paid on May 3, 2017, and the third pay application (of $149,400) paid by the owner on June
12, 2017, the work performed was ultimately accepted (T.T. 182) after Dixie spent the first four
weeks, following Wind Clan's May 5, 2017 termination and ultimate removal from interior work,
reworking or fixing issues that were on Wind Clan's pay applications (T.T. 192). For its part,
Rolin did not perform any audits to determine how much corrective work Dixie performed and
whether the corrective work that Dixie was doing was to correct for work directed by Rolin's
superintendent to be performed. (T.T. 192-93).

Clan-only two-page schedule was showed July 7, 2017 for Wind Clan to complete all of its remaining work. (Plaintiff's Trial Exhibit 4). Seth Smith testified at trial that the first page of the schedule generated for the entire project reflected remaining items listed on the critical path, which included numerous items that were Wind Clan's responsibility. (*Compare* Plaintiff's Trial Exhibit 122 *with* T.T. 98-99). On April 5, 2017, Smith emailed the two-page Wind Clan-only scheduled to Kreutz, Reinhart, Cliff Dorsey and Bear Dorsey and asked for Wind Clan's thoughts. (Plaintiff's Trial Exhibit 55). And while Smith testified that he could not remember Wind Clan ever objecting to the April 5, 2017 schedule (T.T. 100), the documentary evidence demonstrates otherwise, as Kreutz's email response a few hours later contained at least implicit objections: "E has to follow C&D as material is on site for C&D not E," and noted that more time needed to be added for finishing of the drywall, that several activities needed to be added to the schedule (e.g., Z furring for each section and waterproofing the sheathing), and questioned whether the scheduler actually reviewed Wind Clan's proposed schedule (*see* Defendant's Trial Exhibit 131). This response by Kreutz appears to have gone unanswered.

On April 17, 2017, Cliff Dorsey emailed Seth Smith his summary of takeaways from a meeting conducted on April 14, 2017 (*see* Plaintiff's Trial Exhibit 44), which reflects Wind Clan's understanding of its manpower problems onsite and, as well, its acknowledgement that the mockup wall was not done and approved by April 17, 2017 and would not be ready until sometime after April 24, 2017, when its crew of carpenters from the OWA worksite would arrive on the CYDC worksite. (*Compare* Plaintiff's Trial Exhibit 44 *with* T.T. 101). Dorsey's email also reflects Wind Clan's frustration with having

13

to work from two schedules, one which he referred to as Todd Babin's schedule and the second as the one he believed Smith created with Thomas Kreutz and moved Section E to the end of the job (*see* Plaintiff's Trial Exhibit 44, at ¶ 6).

On April 21, 2017, Smith emailed various individuals at Wind Clan, including Cliff Dorsey and Tara Peaden,[9] a "QC Notice" and observed in the email that if the items listed in the notice were not corrected by Monday, April 24, 2017, Rolin would "assist in the correction." (Plaintiff's Trial Exhibit 46, at 1). The notice attached to the email was described as a Notice to Cure—for quality deficiencies and failure to meet schedule—and listed numerous problem areas, including the kitchen area (e.g., walls not complete), the safe room (e.g., need to finish headers), the security safe room (framed wrong), the multipurpose area (complete framing), and contained a fairly comprehensive description about the failure to embed joint tape. (*See id.* at 2). In addition, the attachment to the notice contained general notes related to Phase I of the project (that is, Sections E, F & G) and the need to address the twenty-one deficiencies listed therein. (*See id.* at 2-3; *compare id. with* Plaintiff's Trial Exhibit 66). This notice was generated in direct response to Rolin's receipt of the architect's field report, which specifically pertained to metal stud installation and was forwarded to Wind Clan on April 27, 2017. (*Compare id. with* T.T. 104 & Plaintiff's Trial Exhibit 71, Architect's Field Report; *see* Plaintiff's Trial Exhibits 66 & 67 (reflecting that a list/report was generated in the wake of the April 19, 2017 OAC site walkthrough  and inspections performed by the

---

[9]        Tara Peaden is a member of the Poarch Band of Creek Indians. (*Compare, e.g.,* T.T. 311 *with* Plaintiff's Trial Exhibit 126, Deposition of Tara Peaden, at 32). Since the formation of Wind Clan, Peaden has owned 55% of the corporation; she is considered a 51% owner as far as the tribe is concerned in terms of TERO. (*See id.* at 21).

architect's onsite employee, Steve Dodds, and Rolin's management team and also reflecting that the Owner's representative, Steve Gibbs, gave Rolin a directive to order Wind Clan not to proceed to Phase II framing until all Phase I—that is, Sections E, F & G—had been corrected and passed inspection)). The list of problems contained in the notice (Plaintiff's Trial Exhibit 46, at 2-3) is identical to the list of deficiencies in Phase 1 (Areas E, F & G) generated by Steve Dodds and the "Rolin Management team" during inspections on April 20, 2017 and April 21, 2017 (*compare id. with* Plaintiff's Trial Exhibit 66; *see also* T.T. 253-54).

At 2:34 p.m. on April 25, 2017, Smith advised numerous individuals by email, including Dieter Borrell, the contact architect on the CYDC project (*compare* T.T. 241 (Borrell testified that after designing the project and helping the Owner with the bid process, once construction started, he would review submittals like RFIs and perform site visits to ensure the construction was in accord with the plans and specifications) *with* T.T. 243-44 (the architect prepared weekly reports which served as a jumping-off point to record issues on the jobsite so that those issues could be discussed at the OAC meetings)), that Wind Clan had 60 men onsite and was being supplemented by Dixie Acoustical. (Plaintiff's Trial Exhibit 68, at 2). "We are actively fixing QC items in Phase I but will need to spread the guys out soon in order to maintain the manpower and productivity. We will manage the process to ensure quality going forward but believe this supplementation was necessary[.]" (*Id.*). Less than ten minutes later, Borrell asked Smith: "How long will this be the case? Till the end of the job or for a few weeks until we are back on schedule?" (*Id.* at 1). The architect's questions garnered the following reply from Smith eight minutes later:

15

> Dixie will be completing all the framing going forward—Areas A, B, and C. They are also hired to do the ACT [Acoustical Ceiling Tiles] Ceilings and Wall Panels. They [are] aiding and leading the charge with the QC items in Areas E, F, and G[,] as their staff is more competent.
>
> We are working with Wind Clan on hardi[e] supplemental crew as well[.] [H]opefully [we] will have it resolved by the end of the week.
>
> We do believe Wind Clan should be able to handle and finish drywall but will be on stand[by] to supplement as necessary.

(*Id.*). According to Smith, Rolin wanted to supplement Wind Clan with Jim Boothe Contracting. Wind Clan refused that supplementation but agreed to bring Dixie in because they had a working relationship with Dixie. (T.T. 106).

> So Cliff agreed to bring Dixie Acoustical in, and he would be paying Dixie and bring in Dixie's superintendent, which (sic) was a very competent superintendent. . . . [T]hey would be bringing him in to coordinate all the work, secure all the materials, and essentially finish the project interior-wise for Wind Clan with Wind Clan still providing labor broker help, which was the B&Z and the other labor broker companies.

(*Id.*). In other words, given that Wind Clan could not complete the list of items sent in the notice by April 24, 2017, Rolin and Wind Clan reached an agreement to bring in another subcontractor to help Wind Clan complete the interior of the project. (*Compare id.* at 106-07 *with* Plaintiff's Trial Exhibit 48, at 2 ("Wind Clan and Rolin made an agreement on April 24, 2017 for Dixie Acoustical to supplement and provide the necessary supervision to complete the project."); *but cf.* T.T. 375-77 (Cliff Dorsey's testimony that Wind Clan was "forced to bring [Dixie] in because Rolin was going to supplement us in some[] way. And we came to Rolin and said, look[,] we can bring Dixie in as a subcontractor to work with us. And [Rolin] agreed to that.")).[10]

---

[10]     Wind Clan submitted a third pay application to Rolin dated April 28, 2017 in the amount of $149, 400.00. (Plaintiff's Trial Exhibit 119). That pay application was submitted to the (Continued)

Wind Clan's arrangement with Dixie Acoustical lasted all of one week, as Wind Clan had a disagreement with the Dixie supervisor regarding who was in charge of the job. (*See* T.T. 378). Rolin notified Wind Clan in a document entitled "FINAL NOTICE TO COMPLY" and dated May 4, 2017, that "Cliff Dorsey retracted [the April 24, 2017] agreement [between the two parties regarding Dixie] on May 3, 2017 and removed Dixie's Supervision." (Plaintiff's Trial Exhibit 48, at 2). This notice further advised Wind Clan that it had "until 4 pm, May 5, 2017" to complete numerous items in Sections E, F, G and D and that should Wind Clan fail inspection or not complete all areas, it would be terminated and removed from the project "per Article 10 of the Subcontract Agreement." (*Id.*). Rolin's own counsel and Cliff Dorsey both referred to this notice as a "notice to cure" (T.T. 356-57), as did Kelli Williams (T.T. 789). Seth Smith maintained at trial that because Rolin had sent numerous previous notices and once Wind Clan "failed to meet some of the schedules or guidelines, then yes[,] you can terminate thereafter[]" (T.T. 205), even though both the contract and industry standards require 48 hours' notice and a chance to cure (*compare id. with* T.T. 471 & 790).

On May 5, 2017, before a meeting with Wind Clan on the jobsite, Smith drafted a letter for Shawn Rolin to sign terminating Wind Clan. (*Compare* T.T. 110 *with* Plaintiff's Trial Exhibit 72). At the onsite meeting, according to Smith, "things got a little tense[,]" with Cliff Dorsey "trying to fight with Pat [Newman]" (T.T. 110; *but cf.* T.T. 358-59 (Cliff Dorsey's testimony that he was trying to converse with Seth Smith to see if there was

---

owner in May of 2017, and Rolin received payment for it in June or July of 2017. (*Compare* T.T. 108-09 *with* T.T. 549).

any way to avoid termination and that Newman tried to butt-in on the conversation;

Dorsey told Newman not to interject himself in the conversation but denied telling

Newman that he was going to kick his ass)), at which point Smith testified Rolin

"defaulted them at that point in time immediately." (T.T. 110). Cliff Dorsey testified that

Smith ordered Wind Clan off the jobsite and Wind Clan left. (T.T. 359). Smith agrees

that Wind Clan's crews were shut down and ordered to vacate the jobsite after he

"delivered" the termination letter to Wind Clan. (*See* T.T.112). The unsigned May 5,

2017 termination letter reads as follows:

> Rolin Construction, Inc. is hereby issuing a NOTICE OF TERMINATION to
> Wind Clan Construction for the work included in the Subcontract
> Agreement dated September 19, 2016 (sic) for the Child and Youth
> Development Center—Multipurpose Building. Wind Clan Construction has
> failed to supply sufficient supervision, skilled workers, and material to
> execute the work with promptness and diligence to maintain the project
> schedule.
>
> Per Article Ten of the Subcontract Agreement, Wind Clan shall cease all
> work and leave all equipment, materials, etc. on site for work to be
> completed by others. No payments shall be made to Wind Clan until
> completion of the project and acceptance of Owner. Upon completion any
> monies that are left will be paid to Wind Clan per Article Ten of the
> Subcontract Agreement.

(Plaintiff's Trial Exhibit 72).

The following Monday, May 8, 2017, Rolin had Dixie come back to the jobsite to

take over the interior portions of the work that had been in Wind Clan's scope of work

and actually entered into a "not-to-exceed" subcontract with Dixie to perform that work

based on T&M (time and material) rates plus 20% (that is, 10% overhead and 10%

profit). (T.T.  113 & 116; *see also* T.T. 296-97; *see* Plaintiff's Trial Exhibit 6 (the Rolin-

Dixie subcontract)) The understanding between Smith, Yeager and Wind Clan's Cliff

Dorsey, which was a material provision of Rolin and Wind Clan's May 8 or 9, 2017 oral

contract (*see* T.T. 120 & 360-65), was that the work Dixie performed and each invoice produced would generate "a deductive change order to Wind Clan for that dollar amount." (*Compare* T.T. 113 *with* Plaintiff's Trial Exhibit 49 (May 10, 2017 email from Dixie's Keith Yeager to Rolin's Seth Smith, copied to Wind Clan, about Dixie's offer/quote to do the job at a flat 10% overhead & amp and a 10% profit, with Wind Clan being able to see his costs at any time; and Smith's corresponding email to Cliff Dorsey, also dated May 10, 2017, that Rolin and Wind Clan needed to have a serious discussion about Dixie's quote and specifically asking Wind Clan how it wanted to "handle this and move forward? I know we don't want to file a bond claim.")). And while it is certainly apparent that Wind Clan never overtly objected to the arrangement and contract Rolin and Dixie negotiated (*see* T.T. 120), it charted that course and, indeed, reached an oral agreement with Rolin to return to the project and continue to work on the exterior portions of the project, in light of Rolin's threat to file a bond claim against Wind Clan (*compare, e.g.,* T.T. 362-65 *with* Plaintiff's Trial Exhibit 125, Deposition of Curtis Dorsey, at 62 ("[W]e were strong-armed into believing they were [going to file a bond claim].")) and in hopes that there would be monies left over at the end of the project, after Rolin paid Dixie, that could be applied to Wind Clan's work on the exterior (T.T. 360-61).

The agreement for Wind Clan to continue with the exterior work[11] on the CYDC project site was reached after a meeting between Cliff and Curt Dorsey (for Wind Clan) and Seth Smith and the Rolins (Shawn and Stephanie) on Monday May 8, 2017 or

---

[11]     The mockup wall was thus not an issue with respect to completion of the project. (*See* T.T. 207 ("[Wind Clan] eventually got the mockup correct and did complete the exterior sheathing of the building.")).

Tuesday May 9, 2017 (*see* T.T. 361) and was indisputably an oral agreement (T.T. 218-19) because Wind Clan was terminated under the written contract on May 5, 2017 (*see* Plaintiff's Trial Exhibit 72). This oral contract consisted of Rolin offering and Wind Clan agreeing to complete the exterior scope of work contemplated in the original written contract in exchange for the possibility and hope that there would be monies left out of the original contracted price of $2,098,277.00 and whatever Dixie could perform their work for to be paid to Wind Clan (*see* T.T. 362-63; *see also* T.T. 113, 116 & 120) along with the assurance that Rolin would not file a claim on Wind Clan's bond (*compare, e.g.,* T.T. 517 (Stephanie Rolin's testimony that Wind Clan stayed on the CYDC project because the subcontractor feared that if it left the project Rolin would file a claim on its bond) *with* T.T. 491 (Rolin never filed a claim on Wind Clan's bond)).

Dixie spent the first four weeks correcting deficiencies in Phase I of the project. Wind Clan had already billed for this work. The owner had paid Rolin for it, but Wind Clan had received no payment. (*Compare* T.T. 192 *with* T.T. 290 (Yeager's testimony that he would accept Tony Wright's notes from May 30, 2017, showing that Dixie had finished all of Wind Clan's repairs); *but cf.* T.T. 598-600 & 602 (Dixie's May 10, 2017 removal of metal studs on the storefront in Section E so that the metal studs could be replaced with red iron tubing was caused by Todd Babin's mistake in directing that the storefront be framed with metal studs and the rebuilding of a room in Section E was necessitated by a mistake made by the contractor)).[12] Rolin did not perform any auditing to determine how much corrective work was being done for Wind Clan, as opposed, for

---

[12]     Wright estimated that Dixie spent 2,200 to 2,300 manhours performing rework in Sections E, F, and G. (*See* T.T. 608-09).

example, cleanup around the job site (T.T. 193; *see* T.T. 603-04 & 617-18 (all-day cleanup for sheetrock work is not uncommon)). Yeager's testimony was also clear that though Wind Clan stayed on the job, Wind Clan was not performing any part of Dixie's scope of work and Wind Clan had no right of supervision over Dixie.  (T.T. 294; *compare id. with* T.T. 225 (Smith's testimony that after Wind Clan's May 5, 2017 termination, it had no connection to the project as it related to the scope of work Dixie was performing)).

Dixie left the worksite at the end of July of 2017 after being "told that Seth and Cliff were trying to work it out so that Cliff could salvage some of [Wind Clan's] monies up on the job[.]" (T.T. 279). According to Yeager, Cliff Dorsey told him that Wind Clan took the job back over when they did to try to "salvage as much [money] as they could." (T.T. 296). Cliff Dorsey testified that Smith led him to believe that there was plenty of opportunity for Wind Clan to save money by taking back over from Dixie but denies talking to Yeager about Dixie leaving the worksite. (T.T. 410). Smith testified that he and Cliff Dorsey had a meeting and Rolin "felt that the project was at a place that [Wind Clan] could come back and take over and hopefully try to salvage the money that was left in the project." (T.T. 215). Thus, the oral contract Rolin and Wind Clan had entered into on May 8 or 9, 2017 was further modified by this oral understanding between Smith and Cliff Dorsey at the end of July, expanding Wind Clan's scope of work so that it could salvage as much money as possible.

A form generated by Dixie reflects that it was paid by Rolin a total of $844,091.00 for drywall work it performed after Wind Clan was terminated (*compare* T.T. 282 *with* Plaintiff's Trial Exhibit 114) and, as well, Dixie was paid by Rolin (not Wind Clan) for the

acoustical ceiling tile and wall panel work that was a part of Dixie's original subcontract with Wind Clan (T.T. 281 (Dixie had a subcontract with Wind Clan to perform the acoustical ceiling tile and wall panel work on the project and was to be paid by Wind Clan for that work; however, Rolin paid for the work, not Wind Clan)), ultimately a total of $142, 598.00[13] (*compare id. with* T.T. 284). Yeager testified that Dixie did not overcharge Rolin for the work it performed on the CYDC project (T.T. 285) and that even though Wind Clan never asked to see Dixie's costs, Yeager sent those costs to Wind Clan's Thomas Kreutz, who looked over it and "said everything looked great to him." (T.T. 287).

On the morning of August 2, 2017, Yeager sent an email to Smith (at Rolin) and Kreutz (at Wind Clan), to which he attached a printout and breakdown of Dixie's job costs. (*See* Plaintiff's Trial Exhibit 78). That afternoon, Kreutz advised Yeager, Smith, and Cliff Dorsey that he was "good" with Dixie's "documentation[]" and approved of Dorsey "signing off on the 3 change orders sent to [Wind Clan] by [Rolin's Seth Smith]." (*Id.*) On August 14, 2017, Cliff Dorsey, on behalf of Wind Clan, executed the three deductive change orders previously sent by Rolin for: (1) work performed by Dixie for the time period of April 28, 2017 to May 19, 2017 in the amount of $150,403.50 (Plaintiff's Trial Exhibit 7; *see also* T.T. 139 & 366); (2) work performed by Dixie for the period of May 21, 2017 to June 17, 2017 in the amount of $349,073.17 (Plaintiff's Trial Exhibit 8; *see also* T.T. 139-40 & 366); and (3) work performed by Dixie for the time

---

[13]     ACT/AWP owner-paid materials totaled $90,000.00. (*See* Plaintiff's Trial Exhibit 114). Adding the $142,598.00 to the $90,000.00 totals $232,598.00, the amount of Wind Clan's subcontract with Dixie for installation of the acoustical ceiling tiles and wall panels. (*See* Plaintiff's Trial Exhibit 79).

period June 18, 2017 to July 1, 2017 and for owner-paid materials purchased by Dixie through July 1, 2017 in the total amount of $370,621.00 (Plaintiff's Trial Exhibit 9; *see also* T.T. 140 & 367; *see* T.T. 371-72 (Cliff Dorsey's testimony was that he signed these three deductive change orders only so that Rolin would release $30,000 from another project that Wind Clan was owed)). Thus, with these three deductive change orders signed and approved by Wind Clan's Cliff Dorsey, Wind Clan's original contract price with Rolin was reduced from $2,098.277.00 to $1,228,179.33 (*see* Plaintiff's Trial Exhibits 7-9; *see also* Plaintiff's Trial Exhibit 126, Peaden depo., at 89 (Peaden's testimony verifying these numbers); *see* T.T. 223 (with respect to these three change orders, as well as the change order sent to Wind Clan by Rolin on September 15, 2017—but not executed by Wind Clan—Rolin simply took away money from Wind Clan, the scope of work having been completed for that money)).[14]

An additive change order (Change Order 4) in the amount of $2,500.00 was made to the $1,228,179.33 noted above to increase the contract sum owed to Wind Clan to $1,230,679.33. (Plaintiff's Trial Exhibit 10; *see also* T.T. 140-41). On September 15, 2017, Rolin sent Wind Clan its fifth change order, another deductive change order, in the amount of $302,940.62 (Plaintiff's Trial Exhibit 11)—for work performed by others from July 1, 2017 to final (essentially, the end of July) when Dixie left the jobsite, for

---

[14]     Smith testified that the "contract" to which "changes" were being made with respect to these change orders was the subcontract Wind Clan initially executed on February 13, 2017. (T.T. 223-24). And though Smith recognized that contract had been "terminated," (T.T. 224), he testified as follows: "I guess this should have been a document that kind of reinstated it, that followed up on Cliff's and I's (sic) deal, as you call it." (*Id.*). The Court cannot agree with this testimony and, instead, explicitly finds that the written contract was not reinstated by any action by Wind Clan; rather, the oral contract between Smith (that is, Rolin) and Dorsey (that is, Wind Clan)—which contemplated the same contract price of $2,098,277.00—was as set forth above and these change orders simply "changed" that oral agreement.

owner-paid materials submitted by Dixie in July and August of 2017, and for Rolin-paid items where another company was brought in to help perform Hardie work (*compare id. with* T.T. 141); Wind Clan did not execute this change order (T.T. 142). Nevertheless, as reflected on this change order, the already-reduced contract price between Rolin and Wind Clan was reduced again, taking into account the additive change order, to $927,738.71. (Plaintiff's Trial Exhibit 11).

On October 2, 2017, Cliff Dorsey notified Seth Smith that because of an accident that injured one of its workers on the project site on September 27, 2017, Wind Clan was going to scale back on its long hours—12 hour days, 7 days a week—because of the safety hazard posed by the long hours and because that schedule had "considerably compromised the productivity" of its personnel. (Plaintiff's Trial Exhibit 80). Additionally, Smith was advised that Wind Clan would not add personnel to the project and would, in fact, "be looking to pare down the personnel to find the most efficient crew." (*Id.*). This email garnered a swift "Notice" from Smith and Rolin "for failure to meet schedule and requesting to reduce staff and hours on the project." (Plaintiff's Trial Exhibit 81; *see also* T.T. 128-29). Smith asked for a reconsideration by Wind Clan and confirmation that it would "finish the project based on the current schedule and work through the weekends as required." (Plaintiff's Trial Exhibit 81; *see also id.* ("The project is 25 days from completion, and since returning to finish the project, Wind Clan [h]as **performed very well**." (emphasis supplied)). Cliff Dorsey provided the requested written response by email dated October 4, 2017. (Plaintiff's Trial Exhibit 83).

In response to your notice, we are evaluating our situation.

.    .    .

> [W]e will reconsider and agree to work our personnel 10 hours per day
> through this Saturday. They will not work Sunday. Your demand for twelve
> hours a day, seven days a week is unreasonable, unsafe, and indicative of
> the overall management of the project. Based on studies by the Army
> Corp of Engineers, given these hours, productivity is decreased by 26%.
> In addition, OSHA studies indicated a 37% increase in job related
> accidents.
>
> After Saturday, we'll reevaluate and determine our workload going
> forward. With no unforeseen holdups by weather, the GC, or other subs,
> we should be able to complete our work within the time schedule stated in
> your previous letter, **excluding punch out**.

(*Id.*) (emphasis supplied)[15]

On November 2, 2017, Smith emailed Wind Clan's Larry Davis regarding his belief that Davis told him Wind Clan was "refusing to correct any further drywall work on the CYDC project[]" and would not "punch any walls finished by Dixie Acoustical[;]" Smith asked that Davis confirm in writing Wind Clan's "stances" in these respects. (Plaintiff's Trial Exhibit 85). Smith advised Davis that the fact that the painter "paints a wall" did not relieve Wind Clan of its "contract obligations and quality requirements[.]" (*Id.*). Davis responded to Smith's email in less than two hours, advising that Smith had misunderstood what Davis said in the telephone conversation and that to the extent Smith heard about "onsite" statements, Davis was unsure who may have heard the statements Smith attributed to him since the only Rolin employee Davis spoke to on the site was Pat Newman. (Plaintiff's Trial Exhibit 86). "I did not say we would not correct

---

[15]    At the end of October of 2017 (that is, October 25, 2017) and through November, communications between Rolin's Seth Smith and Wind Clan's attorney, Ryan Hatler, Esquire, became quite contentious. (*See generally* Plaintiff's Trial Exhibits 84 & 86). While both men ostensibly agreed that the two sides should meet to discuss various issues, what they could never agree upon was a proper meeting site. (*See id.*).

drywall defects and of course that includes drywall installed and finished by Dixie as I am very aware we are contractually responsible for all drywall. . . . What I did say to Mr. Newman was that the comments made by the paint subcontractor that we would be subjected to back charges for repainting of touched up rooms was not warranted due to acceptance of those rooms for final paint by the paint contractor." (*Id.*).

On November 9, 2017, Dieter Borrell emailed Todd Babin and others about a field observation report dated November 8, 2017 (and attached to the email) regarding wall finishes. (Plaintiff's Trial Exhibit 87). The architect directed attention to the field notes and advised that "[c]orrective measures" were required "to bring deficient walls to level 4 finish." (*Id.*). Borrell testified that at the visit to the site on November 8, 2017, there were various wall locations where "screws were recessed, joints between gyp panels were not smooth where [one could] actually see the vertical seams[]" and this is what caused the architect to ask for corrections to ensure a level four finish. (*See* T.T. 255).

> Q      At the end of the day, who does the buck stop with to insure a level four finish? Is it on the interior framer or is it on the painter to go back behind [the] interior framer and double check the finishes?
>
> A      If I understand correctly, the painter most likely would say, I cannot install my paint on this because it doesn't meet certain criteria.
>
> Q      But at the end of the day, the interior framer is responsible for the level four finish, right?
>
> A      The installer of the drywall is responsible.
>
> Q      Do you have an opinion as to Wind Clan's quality of work on the CYDC project?
>
> A      It's below average.

(T.T. 255-56).  Borrell testified on cross-examination that in accordance with the specifications prepared by the architect for the CYDC project, a painter is to proceed with coating application only after unsatisfactory conditions are corrected, making it the painter's responsibility to paint only after all unsatisfactory conditions are corrected (T.T. 258; *compare id. with* Defendant's Trial Exhibit 161, § 3.1(E)(1) ("Proceed with coating application only after unsatisfactory conditions have been corrected. [] Application of coating indicates acceptance of surface and conditions."); *see* T.T. 804-08 (Kelli Williams' testimony that painting of the drywall on the hallway was acceptance of the drywall)). However, as Seth Smith's testimony establishes, even though Article 3.1E states application of coating indicates acceptance of surface and conditions, that same article also states that the painter is to verify only that the finishing compound is sanded smooth, not justify whether it's a level three or four finish: "It doesn't tell the painter to gypsum board substrate verify level four. That way, it's not on the painter to do that. It's up to Wind Clan to do that. It's [Wind Clan's] scope of work." (T.T. 209-13; *see also* T.T. 235 (testimony that it was Wind Clan's responsibility, not the responsibility of the painter, to ensure that the walls are a level four finish, and whether or not a wall is a level four finish is up for the architect—ultimately—to decide); T.T. 257 (Borrell's testimony that the painter just has to ensure that the wall is sanded flat, not double-check whether the wall meets a particular level finish-wise)).

On November 14, 2017, Rolin conducted a meeting with all subcontractors about the substantial performance walkthrough that was to occur on November 20, 2017. (T.T. 384). Stephanie Rolin ran the meeting (*see* T.T. 418 (Smith was not at this meeting)) and addressed each subcontractor in turn regarding the remaining work that each

needed to get done to achieve substantial completion on November 20, 2017. (*See* Defendant's Trial Exhibit 134 (video on flash drive[16]); *see also id.* (for instance, Stephanie Rolin first turned to the electrician, who spoke about a lot of issues including that the duct detectors would not meet code; he informed Rolin that a change order regarding the duct detectors had been for three months and he had yet to hear from anyone in that regard)). Rolin instructed Wind Clan not to go into the classrooms (*see* T.T. 818-19 (Rolin did not want Wind Clan to go back into the classrooms because fixing and sanding drywall creates drywall dust that spreads everywhere)), do no touchups in Phase II, and not to go into Phase III at all. When the subject of the inside front of the building and hallway (the atrium area) arose, Rolin advised that her company made a move and brought a crew in over the weekend to get that area to a level 5 finish and specifically stated that she was sure Rolin was "eating that" cost. (T.T. 385 (Cliff Dorsey's consistent trial testimony that during this meeting Wind Clan was told that Rolin would pay for ensuring that the hallway achieved a level 5 finish for the November 20, 2017 walkthrough)). As for whether the remaining walls were all to be level 4 finishing, Rolin indicated that this determination would be made by the architect; she was only concerned about substantial completion. (*See* Defendant's Trial Exhibit 134). Thereafter, Stephanie Rolin was informed of the following: (1) the Hardie was done; (2) the outdoor classrooms were done; (3) the sheetrock was done (Wind Clan being advised, again, that no touchups were to be done to sheetrock); (4) the acoustical ceilings and wall panels were 95% complete (Kenny from Dixie was on this); and (5) with respect to the speaker covers around the outside speakers (the speakers being of

---

[16]    This meeting was videotaped by Wind Clan's John Csanyi. (*See* T.T. 200).

28

different sizes), Rolin's Tony Wright indicated that he would and could fix all speaker issues in an hour to an hour and a half. (*See* Defendant's Trial Exhibit 134; *see also id.* (the clear understanding at the meeting was that Rolin would "eat" the cost of Wright's one and one-half hour of labor to fix the speaker issue)). And to the extent there remained an issue with some round lights and filling in areas above and below those lights, Rolin agreed to perform this rework at no cost to Wind Clan since the contractor had supplied the cardboard pattern/template to Wind Clan, (*See id.*). The bottom line was that Rolin's Tony Wright and Todd Babin informed Stephanie Rolin, when asked, that Wind Clan's work was at substantial completion. (*See* Defendant's Trial Exhibit 134). Accordingly, Rolin informed Wind Clan that it did not need to send any men out to the jobsite between November 14, 2017 and November 20, 2017 and could wait for the owner's punch list. (*See id.* (Cliff Dorsey commented on at least two occasions during the meeting that Wind Clan would await the owner's punch list before performing any additional work)).

On November 15, 2017, Cliff Dorsey sent a letter to Stephanie Rolin to confirm Wind Clan's takeaways from the meeting on November 14, 2017 (Plaintiff's Trial Exhibit 51). Of note, Dorsey indicated that Wind Clan would return a crew to the project to perform any items on the Owner's Punchlist related to Wind Clan work (*see* Plaintiff's Trial Exhibit 51), a point (among others) about which Stephanie Rolin disagreed (*see* Plaintiff's Trial Exhibit 50). Indeed, Rolin testified at trial that this first bullet point was incorrect because Rolin generated punch lists before the architect's walkthrough and, therefore, Wind Clan had to punch both lists and maybe even a third list. (*See* T.T. 527-

30).[17] By letter dated November 17, 2017, Cliff Dorsey objected to the items listed in

Rolin's letter dated November 15, 2017. (Plaintiff's Trial Exhibit 17, at 3). "Wind Clan

attended the subcontractor coordination meeting with the specific intent to ascertain the

manpower needed to finish any work required prior to substantial completion.

Stephanie, you specifically stated that no manpower from Wind Clan was needed until

AFTER the substantial completion walkthrough is complete and an AE/Owner punch list

is received. You also stated that the rework being done in the atrium was 'on Rolin' as

you decided to accommodate the owner's request for a higher-level finish than

specified." (*Id.*).

The architect did not find that the project was at substantial completion after the

November 20, 2017 walkthrough. (T.T. 563-64).[18] Wind Clan received a punch list (a

365-page handwritten punch list) after that meeting, but it did not return to the site to

complete the items for which it was responsible (T.T. 133; *compare id. with* T.T. 419,

446 & 843 (testimony that Wind Clan never returned to the jobsite after the November

14, 2017 meeting)).  Rolin's Seth Smith emailed the punch list generated by the

---

[17]     With respect to the punch list, or resolution checklist, updated on October 19, 2017 (*see* Defendant's Trial Exhibit 166), Kelli Williams testified that the items on that list that were or could have been on Wind Clan's scope of work could have been fixed in about two hours (*see* T.T. 810-14).

[18]     Close in time to the architect's walkthrough, Steve Ledkins, the director of public works for the Poarch Band of Creek Indians, called Stephanie Rolin and asked her to walk the inside of the project with him; he pointed out a number of problems with the walls and stated that the owner was not going to accept the building. (T.T. 519-21; *see* Plaintiff's Trial Exhibit 125, Peaden depo., at 70-72 (Ledkins contacted Sandy Hollinger, a tribal council member, and Sandy called Peaden and told her Wind Clan's work was not acceptable)). Rolin called Seth Smith after she walked the inside of the building with Ledkins; Smith told Rolin that he had another subcontractor coming in to fix the problems because Wind Clan told him it was not coming back (T.T. 522). At this point, Rolin told Smith to get someone in to fix it before the architect and owner returned and that Rolin would eat that cost. (*Id.*).

Architect and the Owner to all subcontractors on November 28, 2017 (Plaintiff's Trial Exhibit 93 ("We have until December 13th to complete all items on the punch list.")) and emailed Wind Clan two days later, on November 30, 2017, to ask for its "stance on completing the punch list at CYDC." (Plaintiff's Trial Exhibit 96).[19] According to Wind Clan's Kelli Williams, the list was not easy to read and Wind Clan had requested assistance from Rolin in determining the items for which it was responsible (T.T. 447). However, the architect, Dieter Borrell, credibly testified that no subcontractor other than Wind Clan complained about being unable to read or interpret this punch list. (T.T. 265; *see* T.T. 260 (Borrell's testimony that while a number of locations that needed fixing were identified during the OAC walkthrough on November 20, 2017, no subcontractor other than Wind Clan would have had any issue with the architect's comments and would have been able to finish the fixes without any issues)). Moreover, when Williams was given a copy of the punch list during trial, the most she could offer was that the scan she was shown at trial was better than the one Wind Clan received from Seth Smith; it was clear from her testimony though that the list was not illegible. (*See* T.T. 838-40).

On November 29, 2017, Rolin initiated and sent to Wind Clan Change Order 6, a deductive change order in the amount of $5,000.00 due to Wind Clan's failure to install Bird Spikes (*see* Plaintiff's Trial Exhibit 95), reducing the already reduced amount of $927,738.71 to $922,738.71.

---

[19]     Therefore, according to Stephanie Rolin, any possible miscommunication in the November 14, 2017 meeting would have been cleared up two weeks later when the architect sent the punch list and Seth Smith emailed Wind Clan. (T.T. 569-70).

On December 1, 2017, Rolin's Seth Smith emailed Wind Clan advising that it could consider the attachment to the email as "a formal 48-hour Notice of Default per Article Ten of the Subcontract Agreement." (Plaintiff's Trial Exhibit 98). Smith's attached letter is referenced as a "Notice to Comply" and called attention, in relevant measure, to Wind Clan's refusal to send a crew to complete punch list items and the fact that all other subcontractors had been able to read the punch list and understand the scope of their work. (Plaintiff's Trial Exhibit 98, at 2). Smith set a deadline for Wind Clan to return to the site and complete its punch list items. (*Id.*). Wind Clan rejected this notice. (Plaintiff's Trial Exhibit 17; *see also id.* ("When you can provide a Wind Clan punch list that is legible and that includes the work you consider to be Wind Clan's responsibility, we will evaluate and send crews to perform the work.")).

On December 4, 2017, Rolin sent Wind Clan a letter of termination. (Plaintiff's Trial Exhibit 13). "No payments shall be made to Wind Clan as cost[s] are expected to exceed the contract amount, therefore your bonding company is being put on notice of claim." (*Id.; see also* Plaintiff's Trial Exhibit 18). Wind Clan responded by letter dated December 6, 2017, that Rolin's termination letter was without cause or merit because Wind Clan "refutes the allegations of default contained in your December 1, 2017 Notice to Comply and does not recognize your demands in that letter are valid or reasonable." (Plaintiff's Trial Exhibit 19, at 1; *see also id.* at 1-2 (setting forth, in part, that substantial completion of the project was not being held up due to Wind Clan's punch list items but, instead, by other issues and offering the explanation that its request for a legible punch list was merely an attempt to obtain a punch list to review for scope because it would be "unreasonable for a subcontractor to blindly send manpower to a job without the ability

to fully assess the scope of work.")). This letter also served as formal notice to Rolin of Wind Clan's intent to pursue a bond claim (*see id.* at 2) and, indeed, two days later, on December 8, 2017, Wind Clan sent to Rolin's bonding company a notice of non-payment and claim. (Plaintiff's Trial Exhibit 20).[20]

Rolin responded to Wind Clan's December 6, 2017 letter by its own letter dated December 11, 2017 and, in relevant measure, simply stated that it never excused Wind Clan from performing any post-inspection punch list work. (*See* Plaintiff's Trial Exhibit 21). Wind Clan sent its letter response on December 18, 2017, continuing to assert that its termination was wrongful and unwarranted. (Plaintiff's Trial Exhibit 22). "Wind Clan did not refuse to participate in the Punch List work prior to the Termination by Rolin. Wind Clan was directed to resume Punch List activity after Substantial Completion of the Project." (*Id.*) By letter dated December 20, 2017, Rolin responded that "Wind Clan's failure to return to the jobsite to complete punch list work, after proper demand from Rolin Construction, was a material breach of the Subcontract." (Plaintiff's Trial Exhibit 102).

Some of the reasons Rolin could not get a certificate of substantial completion on November 20, 2017 were related to the challenges with the testing and balancing (T.T.

---

[20]    Wind Clan did not make the actual bond claim until February 28, 2018. (*See* Plaintiff's Trial Exhibit 24). Williams admitted during trial that the affidavit signed by Tara Peaden in support of the bond claim showing an agreed contract price between Rolin and Wind Clan of $2,527,161.51 was inaccurate (T.T. 456-57; *see also* Plaintiff's Trial Exhibit 126, Peaden depo., at 87-8 (the contract price was never $2,527,161.51 and, therefore, the insertion of this amount in the affidavit attached to the bond claim was inaccurate; according to Peaden, this was the amount of money Wind Clan spent on the job and for which Wind Clan was seeking repayment)), yet Wind Clan never submitted an amended bond claim (*see id.* at 457) or otherwise corrected the claim (T.T. 477). Hartford denied Wind Clan's bond claim on March 14, 2018. (Plaintiff's Trial Exhibit 108).

157-58), signage (T.T. 159), and many other issues that dealt with every aspect of the job. The final test and balance was approved on December 29, 2017, the date of substantial completion. (*Id.; see also* T.T. 138; Trial Exhibit 120 (certificate of substantial completion dated December 29, 2017)). Kelli Williams admitted that Wind Clan made mistakes in performing its work at the CYDC project and while some of those mistakes may have extended durations of activities, her clear trial testimony was that Wind Clan did not extend the duration of the project schedule. (*See* T.T. 460-61; *see also* Trial Exhibit 125, Curtis Dorsey depo., at 81-82 (witness expresses doubts that Wind Clan "got everything right" on the CYDC project)).

Stephanie Rolin testified that in 99 percent of commercial contracts, substantial completion occurs when the owner can accept the building as done and habitable except for punch list items and that was what she was making reference to during the meeting on November 14, 2017. (T.T. 561). The next step, after substantial completion, is final completion, which means all punched items are done and everything is 100% complete. (*Id.*). According to Rolin, she "probably" told Wind Clan it did not "need to come back until substantial because substantial, for [her], was in six days [on November 20, 2017] when the architect came, walked the job, said okay[,] you're substantial and here's your punch list . . . [that] you guys need to complete[.]" (T.T. 563). Of course, the architect did not tell Rolin that the project was at substantial completion on November 20, 2017. (T.T. 563-64). And when counsel for Wind Clan began to point out a number of non-Wind Clan items that may have prevented the architect from certifying substantial completion—such as the sewer not being connected, the generator not being tested, whether the fire alarm met code (which was being held up because

34

engineers were redesigning some electrical and fire alarm)—Stephanie Rolin's testimony indicates that in accordance with industry standards, the project should have been certified as substantially complete during the walkthrough on November 20, 2017 but that the architect on this project wrote the specifications in such a manner as to define substantial completion as what is normally regarded in the industry as final completion. (T.T. 564-66). It is difficult for the Court to reconcile this testimony with the contents of the Architect's email to Rolin on December 29, 2017 (*see* Defendant's Exhibit 150), the date Rolin received the certificate of substantial completion (*see* Plaintiff's Trial Exhibit 120), as Dieter Borrell's email establishes that he had not received the TAB report and addressed matters to suggest that final completion was not on the horizon (*see* Defendant's Trial Exhibit 150 ("A final inspection will be required once you're ready with all the documentation and all the comments made on the punch list have been completed. Please give us [a] 15 day notice to schedule the teams to perform final inspections.")).

On January 12, 2018, Rolin sent Change Order 7, a deductive change order to Wind Clan related to the acoustical ceiling tiles and wall panels installed by Dixie in the amount of $232,598.00 (Plaintiff's Trial Exhibit 103), reducing the contract total from $922,738.71 to $690,140.71 (*id.*).[21]

---

[21]     Wind Clan had a subcontract with Dixie, executed prior to Wind Clan's May 5, 2017 termination (that is, at the beginning of the CYDC project), which provided that Dixie would install all acoustical ceiling tiles and wall panels in the auditorium area of the project (T.T. 127; *see also* T.T. 375) for $232,598.00, which was part and parcel of the total Wind Clan contract amount of $2,098,277.00 (*see* Plaintiff's Trial Exhibit 79). This acoustical ceiling tile and wall panel work was to take place toward the very end of the project. (T.T. 375).

A Change Order dated January 29, 2018, Change Order Number 2, increased the original contract sum, in Rolin's contract with the owner, from $14,800,000.00 to $14,941,204.91. (*See* Plaintiff's Trial Exhibit 121). Only one item in the change order driving the change in the contract sum related to Wind Clan work. (*See id.*) In addition, but importantly, the contract time was increased by 112 days, such that the date of Substantial Completion as of the date of this Change Order was December 16, 2017. (*Id.* at 2; *see also id.* ("Time extensions due to weather delays (+67) and due to added scopes of work affecting the job schedule (+45 days) for the period from October 2016 through November 2017: Add 112 calendar days.")).

Rolin demobilized from the site close to February 26, 2018 (*see* T.T. 137), the date Seth Smith sent Michelle Canterbury, at Wind Clan, an email advising that Wind Clan had exceeded its contract value and, therefore, did not have the funds in the contract "for any Owner Paid Material invoices to be processed." (Plaintiff's Trial Exhibit 106). That email reflects that Wind Clan's owner-paid materials totaled $552,370.79 (T.T. 138). That same date, February 26, 2018, Rolin sent Wind Clan Change Order #8, which reflected work performed to complete the punch list. (T.T. 143; *compare id. with* Plaintiff's Trial Exhibit 105). The total listed on this change order of $113,792.05 was broken down as follows: $27,589.51 for Rolin construction cost and $86,202.54 for painting cost by Willard Rogers. (Plaintiff's Trial Exhibit 105). Seth Smith offered the following testimony: "That's where we had all the level four finish issues and had to have Willard Rogers come back in and finish those walls and then repaint them to get to the appropriate finish." (T.T. 143-44). This deductive change order reduced the contract

36

balance to $576,348.66 (Plaintiff's Trial Exhibit 105) from the previous amount of

$690,140.71 after Change Order 7.

On March 13, 2018, Rolin sent Wind Clan Change Order #9, a deductive change

order in the amount of $2,119.00 for "chan[g]ing multipurpose room walls from F6 to B2

wall types[.]" (Plaintiff's Trial Exhibit 107). This deductive change order reduced the

contract balance to $574,229.66 (*id.*), which was the amount left over after

consideration of all change orders (T.T. 145). Thereafter, Rolin deducted Wind Clan's

owner-paid materials of $552,370.79 (*compare* T.T. 547-48 *with* Plaintiff's Trial Exhibit

124),[22] leaving a total owning under the contract of $21,858.87.

Seth Smith testified that the purpose of a construction schedule is to serve as a

guideline for the project to be built (T.T. 50) and that sequencing involves arranging a

group of activities or tasks to be performed "in order to achieve an end result in the most

efficient manner possible." (T.T. 51). Because there were 25 to 30 different trades on

the CYDC project, for instance, the purpose of the schedule was to "[p]ut the events in

order of what has to happen first to last in order to finish [the] project." (T.T. 51-52).

Some activities in a given project are more important than others and, therefore, are on

the critical path, which is the longest path of the schedule and consists of activities that

---

[22]    The Poarch Band of Creek Indians is a tax-exempt organization with respect to
its involvement with projects on trust property; therefore, to get the tax exemption benefit, the
owner would pay all invoices for materials submitted by all subcontractors to Rolin and at the
end of the project Rolin would get a deductive change order from the owner for owner-paid
materials and then took the amount of owner-paid materials attributable to each subcontractor
"off" that subcontractor's contract total. (*See* T.T. 125). And because each subcontractor was
aware of this "process," owner-paid materials were "figured-in" to the subcontractor's bid and
the contract total.

must occur in sequence for the building to become substantially complete. (*See* T.T. 52). Auxiliary events and activities have float time built in them and generally are not on the critical path, "meaning they can occur at any point in time within a certain time frame without hitting the main activities of the schedule or the longest path of a schedule or longest path of sequenced events to occur in order to finish a project." (*Id.*; *see also id.* at 53 (defining float as the amount to time in which a particular activity has to occur before it transitions to being on the critical path)). So taking the April 5, 2017 schedule (Plaintiff's Trial Exhibit 122), reflecting a substantial completion date of August 30, 2017, Seth Smith testified that there were clearly multiple line items or sequences on the critical path for which Wind Clan was responsible and its failures caused other trades scheduled to follow Wind Clan to stack up and experience delays (*compare id. with* T.T. 149-51; *see also* T.T. 869-72 (Williams agreed that Wind Clan missed a plethora of milestone dates set out in the January 25, 2017 schedule and the April 5, 2017 schedule)).

Damages Plaintiff claims in this lawsuit basically are set forth in an attachment to Seth Smith's February 15, 2018 letter to Cliff Dorsey. (Plaintiff's Trial Exhibit 1, at 2; *see also* T.T. 537-38). Rolin is seeking to recover from Wind Clan: (1) direct costs to Rolin— fuel, materials and tools purchased by Rolin for Wind Clan to keep the subcontractor going forward on the CYDC project and to pay subcontractors to complete Wind Clan's punch lists—totaling $39,453.00 (*compare* Plaintiff's Trial Exhibit 1, at 2 *with* T.T. 538- 40; *see* T.T. 506-07 (Stephanie Rolin's testimony that Rolin had to purchase almost $20,000.00 in fuel for Wind Clan to run its lifts)); (2) $86,202.54 paid by Rolin to Willard Rogers to correct Wind Clan's drywall work (to get it to level 4) and, once corrected, to

repaint the drywall work (*compare* Trial Exhibit 1, at 2 *with* T.T. 540-41); (3) $76,439.00 paid to Bagby & Russell for delays and purported overtime it paid to its employees to make up for the delays in the schedule caused by Wind Clan, as well as an additional $25,600.00 Rolin paid to Bagby & Russell for damaged work, where Wind Clan ripped out Bagby's work in order to make corrections to Wind Clan work thereby requiring B&R to come back and replace its previous work (*compare* Plaintiff's Trial Exhibit 1, at 2 *with* T.T. 541-42; *see* T.T. 549-53 (B&R made an informal claim to Rolin and was the only subcontractor to do so; Rolin performed no investigation with respect to the documentation B&R sent in support of the two amounts claimed)); and (4) Rolin delay cost, which it calculated as four months of general conditions totaling $223,616.25 (*compare* Plaintiff's Trial Exhibit 1, at 2 *with* T.T. 542-45; *see also* T.T. 149 (general conditions do not include work in place but, instead, consist of overhead—supervision, project management, insurance, power bills, etc.—to make the project run)). Seth Smith came up with the four months based upon his "belief" that Wind Clan delayed the completion of the CYDC project by some four months. (T.T. 148). Smith testified that he took the April 5, 2017 schedule (because that was the schedule that Wind Clan "bought into") (T.T. 150)), which had a completion date of August 30, 2017, then took into account that the general contractor (in this case, Rolin) will be out on the project site for two additional months after substantial completion doing punch lists, arriving at the end of October, and then "charg[ed Wind Clan] for November, December, January, and

February." (T.T. 149). "As [Rolin] looked at it, based on that schedule, Wind Clan delayed the project four months." (*Id.*)[23]

John Buziak is a construction scheduler, who also does claims analysis and work as an expert witness. (T.T. 627). Defendant's expert witness testified that he did not hear in Seth Smith's testimony any calculation whatsoever to attribute a four-month delay in the CYDC project to Wind Clan. (*See* T.T. 641-42). Moreover, Buziak identified two problems with Smith's approach: first, Smith was referring to a schedule that was defective and not usable for that purpose because, in particular, it was missing the mechanical build-out (T.T. 642; *see also* T.T. 648 ("You couldn't properly define the critical path with the Baseline schedule because of the lack of detail . . . . In particular, . . . a lot of the major mechanical systems were not detailed on the schedule. So the schedule didn't define the full scope."); *see* T.T. 649 (Buziak looked at all the schedules generated by Baseline consultants but referred to the January 25, 2017 schedule as the "baseline" schedule because it was the first complete schedule that could be utilized to manage the CYDC project)) and, second, the critical path changed, as borne out by the schedules prepared by Baseline Consultants and by the witness's own analysis (T.T. 649; *see also id.* at 649-50 (Buziak's testimony that the schedules and his own analysis initially reflected that the last slab poured in the build-out was going to finish last and that was going to drive the critical path but what happened is that because of issues in the safe room and mechanical systems, those paths were delayed and overtook the interior

---

[23]     Kelli Williams testified, however, that based on everything that was noted during the November 14, 2017 subcontractors' meeting, in the context of Rolin's belief that substantial completion would occur on November 20, 2017, all delay thereafter would be concurrent delay. (T.T. 830-31; *see also id.* at 830 (defining concurrent delay as "delay that goes on at the exact same time.")).

buildouts); *see id.* at 650 (testimony that the majority of construction jobs end up late, even where schedulers are involved)).

Buziak testified that he was hired initially to look at the construction schedule and ascertain whether Wind Clan delayed the project and, as his work progressed, he performed an earned value analysis on the work that Wind Clan had in place. (T.T. 634). With respect to the first task, Buziak utilized the forensic schedule analysis (or 29R) to determine whether Wind Clan delayed the CYDC project (*See* T.T. 634-35; *see also id.* (materials and information utilized); *compare id. with* T.T. 730-32 & 761 (the expert was never tasked with determining exactly how many ways the project was delayed or the number of delay days attributable to the contractor or any particular subcontractor but testified he could not attribute days of delay to anyone because that would require a schedule that could stand up to standards for forensic analysis and no such schedule existed in this case)). In terms of the development of his model, and the validation of the model, Buziak testified that he initially utilized daily reports to start a daily delay method (T.T. 636 ("[I]t's a timeline. And it compiles and correlates the various daily logs and shows what days what activities were being performed and who was performing them.")) and then when he received copies of the Baseline schedules, he utilized them to "[a]ccomplish FSA S[V]P 2.1, Pages 18 through 20." (*Id.*).

> And what that is, there are established criteria for taking a schedule and using it to do any kind of forensic work or use it as a tool in this kind of a venue.
>
> In particular, it looks for a network that's fully connected and logically executable. It looks to see that . . . all the scope in the project is defined in the schedule. And that's really key because you find very many sages on the site who will tell you before you ever set foot on it that they know what the critical path is going to be. And then when you assemble all

that material together and you put it into a network and you get the durations in there, you find out it's not what they expected at all.

.     .     .

[When Buziak received PDFs of the Baseline schedules, which did not have native format data, he] first went through those schedules[ and] it was clear they were not to [an] appropriate level of detail to demonstrate a proper critical path. The other thing is they didn't have all the scope defined that you would need to properly identify a critical path.

So there was some value in them because you could see progress data that had been collected over time and use that to estimate the slippage in the schedule[,[24] but a]s far as being able to demonstrate delay along any particular path, [that was] just not possible the way the schedule is structured and the level of detail it's at.

(T.T. 636-37 & 639). The unreliability of the schedules, however, did not prevent Buziak from forming opinions about which he could testify to with a reasonable degree of engineering certainty because he was able to take the daily logs, identify the activities that were part of the project, and then trace the longest path through the project. (T.T. 639-40).

Buziak defined critical path as "the longest path that's a sequence of events from the beginning of the project to the end of the project that defines the length of the project[]" and further, that as long as an activity is not on the critical path, the project is

---

[24]     Buziak gave extensive testimony about the October 2016 "placeholder" schedule and the January 25, 2017 schedule (*see generally* T.T. 650-73) in an attempt to establish that Rolin compressed the project schedule by two months and/or otherwise fiddled with the schedule to show the project was going to finish on time (in an attempt to recover schedule), wreaking havoc on the mechanical subcontractor and the guys hanging the storm drain in the roof (*see id.* at 673 (Buziak's testimony that neither one of these subs came close to meeting the milestones set forth in the January 25, 2017 schedule)), and to show (for various reasons) that the CYDC was not ready for interior buildout—consisting of the MEP rough-ins, including fire protection if that is a part of the building's scheme, the framing, hanging drywall, and finishes (including paint), as well as fire alarms. (T.T. 652; *cf.* T.T. 392 (Cliff Dorsey's testimony that when Todd Babin directed Wind Clan to start putting up framing no other MEP trade was on the worksite))—on February 16, 2017 and that the interior buildout suffered from improper sequencing (*see, e.g.,* T.T. 657-58, 672 & 687).

not being delayed. (T.T. 640; *see also* T.T. 653 (the critical path can be looked at as "the longest path through the schedule, which we described yesterday as a sequence of activities that are linked together that are the longest path and determine the length of the project.")). He also indicated that critical path could be looked at in terms of the float criteria, "[s]o the most negative path through the schedule [] where you ha[ve] the most negative float . . . that's going to be a critical path." (T.T. 653-54). Buziak described float in a schedule as: "Mathematically, all these activities are computed off of a network. And you can start with a first activity and compute forward through the schedule and that will give you what are described as the early dates. You can also start at the last activity in the schedule and [] from your projected finish date or [] anticipated finish date and go backwards and see . . . where you end up as a start. . . . The gap between the early dates and the late dates is the float." (T.T. 654).

According to Buziak, the critical path was through the build-out of the mechanical room, the clearing up of the punch list/field report provided by Premier Engineering in late September of 2017, the overhead rough-in and then back into the steel[25] and to the foundations. (*Compare* T.T. 682 *with* Defendant's Trial Exhibit 157(b), at 6 (same); *see also* T.T. 713-14 (September 22, 2017 field inspection report by Premier Engineering detailing mechanical discrepancies that needed to be completed before testing could start); T.T. 739 & Defendant's Trial Exhibit 157(b), at 5 (the MEP trades and Rolin bore the responsibility for the overhead rough-in, which took several more months than

---

[25]    Late in the construction process, it was determined not only that the steel erectors missed some welds and that additional bracing was necessary in the saferoom, which "interfered with just about everybody." (T.T. 686; *see also* T.T. 685).

planned) and provided an indicator of where the true as-built critical path flowed)). Thus, according to Buziak, Wind Clan's work was not on the critical path and, as a result, Wind Clan did not delay the project because a necessary condition for delaying a project requires that the work performed be on the critical path. (T.T. 731; *see also* T.T. 744 (Buziak's opinion that the exterior wall is not on the critical path, though he admitted that a building cannot exist without an exterior wall); *see* T.T. 743-44 (any problems Wind Clan had in February, March, April, and May of 2017 in getting the right materials onsite did not impact the critical path).

Rolin's extensive trade stacking started in mid-April and continued until August and further complicated the analysis. (T.T. 683). Buziak also gave rather extensive testimony regarding pictures showing trade stacking, improper sequencing—leading to rework (T.T. 706 (every construction project has some measure of rework but some rework can be avoided by good sequencing and rework increases with the stacking of trades))—and unexpected pacing (*see* T.T. 695-705; *see also* T.T. 703 (unexpected pacing comes in when, for example, because the fire stations had not yet been installed Wind Clan or Dixie had to leave drywall out)), all of which were factors in delaying completion of the project (*compare id. with* Defendant's Trial Exhibit 157(b), at 8-11).

Buziak testified that he saw no evidence that the CYDC project was ever ahead of schedule from the point where time was lost in the rains in December of 2016, and, therefore, certainly was not ahead of schedule when Wind Clan arrived onsite. (*See* T.T. 707). Moreover, with respect to whether Wind Clan was on the critical path, Buziak's testimony was clear that the Baseline schedules, including the April 5, 2017 schedule, could not be utilized to judge the critical path. (*Id.*; *see* T.T. 707-08 (Buziak's

description of the April 2017 schedule as a "progress defective January schedule"

because while it had dates "all the dates had slid to the right" principally because of

delayed steel erection)).

The second major task that Buziak performed was to provide an estimate of work

in place using an earned value analysis. (T.T. 715; *compare id. with* Defendant's Trial

Exhibit 157(a)).

> You take the contracted value. You allocate it across activities in the project. That was my step one.
>
> Once I did that, I went back to the other documents I had assembled over the course of the project and estimated the progress of each one of these activities by month for both Wind Clan and Dixie. And then they got that percent of value for that activity.
>
> And in the end, I think I came up with . . . 1.37[4] [] million . . . for work of Wind Clan's in place, and Dixie's was 700,000.
>
> . . . [I]n this method, you don't attempt to account for rework. This is just what's the value, you know – the basic principle is something is worth what somebody else will pay for it. What they're willing to pay for it was a contract value, and this is what's the work in place attributable to each one of those parties.

(T.T. 715-16; *see also* T.T. 720-22 (Buziak's testimony that he started with the contract

price and allocated the value of activities performed to the entity that performed those

activities); *see* T.T. 716-18 (Buziak's testimony about attachments to his analysis,

including an activity sheet and backup for the allocation); *compare id. with* Defendant's

Trial Exhibit 157(a), at 3 ("The value for the WIP for WWC is $1,374,187.55, and for

Dixie is $724,589.45. Additionally, the sums have a zero sum relationship. The

combined value must total to $2,098.777.")). Buziak testified on cross-examination that

he did not consider the change orders issued in this case, including the three executed

by Wind Clan (T.T. 722) or the value of owner-paid materials (T.T. 724; *see also id.*

(recognizing that the value of the owner-paid materials on the CYDC project, for Wind Clan and Dixie, totaled roughly $952,000.00)).

Wind Clan's cost report for the CYDC project reflects that the amount of money it paid out—for labor, subcontractors, and materials that were "outside" the owner-paid materials—to complete the project totaled $1,807,560.00. (*Compare* Defendant's Trial Exhibit 167 *with* T.T. 814-15). However, this exhibit also reflects a line item for attorney's fees (*see* Defendant's Trial Exhibit 167, at 4); therefore, Wind Clan started from a point of $1.8 million, subtracted the attorney's fees, and then added interest in the amount of $35,000 on pay applications 1-3 and an overhead/fee of $299,516.34 to reflect a subtotal owed to Wind Clan of $2,116,051.00[26] (Defendant's Trial Exhibit 168) should the Court find that "this was a termination for convenience[.]" (T.T. 817). According to Williams, the original written contract between Rolin and Wind Clan contained no provision for partial termination for cause nor is there any industry standard providing for a partial termination for cause (T.T. 825);  however, the contract does recognize, as does the industry, a partial termination for convenience, which allows for the de-scoping of part of the work but not all the work and allows for compensation for the amount of work performed (T.T. 824-25).

## CONCLUSIONS OF LAW

A.    **Wind Clan's May 5, 2017 Termination.** Rolin failed to give Wind Clan the required 48-hours-notice of default and an opportunity to cure before issuing written

---

[26]    Wind Clan **WITHDREW** the request for the $43,109.59 Artemis charge reflected in Defendant's Trial Exhibit 167 which is also reflected in (or part of) the first line item (the $1.8 million) in Defendant's Trial Exhibit 168. (*See* T.T. 837).

notice of termination (Plaintiff's Trial Exhibit 32, Article Ten: Termination ("If SUBCONTRACTOR at any time shall refuse or neglect to supply sufficient, properly skilled workers, or materials, or equipment of the proper quality and quantity, or fail in any respect to prosecute the work with promptness and diligence or to maintain the schedule of work, or cause by any action or omission the stoppage or interference of work of CONTRACTOR or any other subcontractor or fail in the performance of any of the covenants contained in this Subcontract Agreement, or be unable to meet its debts as they mature, CONTRACTOR may at its option and at any time after serving 48 hour[s] notice of such default, ***and should SUBCONTRACTOR not cure such default within 48 hours, CONTRACTOR may***[27] terminate this Subcontract Agreement by delivering written notice of termination to SUBCONTRACTOR."))[28] for failure "to supply sufficient supervision, skilled workers, and material to execute the work with promptness and diligence to maintain the project schedule[]" (Plaintiff's Trial Exhibit 72). Given the impropriety of Rolin's May 5, 2017 written termination of Wind Clan, this Court deems the act to be a termination for the convenience of Rolin. (*See* Plaintiff's Trial Exhibit 32, Article Ten: Termination ("In the event any exercise by CONTRACTOR of its remedies under this Subcontract Agreement shall be determined to have been wrongful, such exercise shall be deemed a termination for the convenience of the CONTRACTOR under this Article.")). The Court further finds the termination on May 5, 2017 to be termination of the whole of the Subcontract for convenience, given that the termination

---

[27]     Rolin and Wind Clan added the highlighted language after negotiation.

[28]     Given the provisions of the Subcontract, the undersigned has no reason to doubt Kelli Williams' trial testimony that the standard in the construction industry is to provide 48-hours-notice and an opportunity to cure within that 48-hour window. (*See* T.T. 471 & 790).

letter states that the termination was "for the work included in the Subcontract Agreement" and, further, instructed Wind Clan to cease all work and leave all equipment and materials onsite so that its work could be completed by others. (*Compare* Plaintiff's Trial Exhibit 72 *with* Plaintiff's Trial Exhibit 32, Article Ten).

      **B.**    **Termination of Convenience and Related Calculations.** Therefore, under the terms of the Subcontract, Rolin was required to compensate Wind Clan for any "acceptable Work performed to the date of termination," provided Rolin received payment for Wind Clan's work from the Owner. (*See id.*). The Owner paid Rolin for Wind Clan's work performed to the date of termination, as reflected in Wind Clan's first three pay applications to Rolin. The three applications totaled $300,600.00 (*see* Plaintiff's Trial Exhibits 117-119). However, what could not be determined at the time of termination was the value of the "acceptable Work performed" by Wind Clan to the date of termination. (*See* T.T. 182). Seth Smith testified that Wind Clan's work was ultimately accepted after Dixie's rework (*compare* T.T. 182 *with* T.T. 192). When combined with the evidence of record that Dixie finished its repairs of Wind Clan work on May 30, 2017 (after starting that work on May 8, 2017), the value of Wind Clan's "acceptable Work performed" can be determined by subtracting from the total of the three pay applications (that is, subtracting from $300,600.00) the monies Dixie expended from May 8, 2017 through May 30, 2017 in repairing Wind Clan's work (that is, performing rework). And while this Court cannot determine a "to-the-penny" amount attributable to Dixie's repairs or rework of Wind Clan's work, based upon the amounts Dixie billed for work from April 28, 2017 to May 19, 2017 ($150,403.50) and for work from May 21, 2017 to June 17, 2017 ($349,073.17), and extrapolating from there, the Court finds that Dixie billed Rolin

a total of approximately $180,000.00 for repairs to or rework of Wind Clan's work reflected in the three pay applications. Rolin is **ORDERED** to pay to Wind Clan the sum of $120,600.00 under the express terms of the written subcontract for "acceptable Work performed" by Wind Clan to the date of termination.

C.   <u>Rolin's Subcontract with Dixie and Oral Contract with Wind Clan.</u>[29]

Rolin asked Dixie to come back to the jobsite on the Monday after Wind Clan's May 5, 2017 termination to take over the interior portions of the work that originally had been in Wind Clan's scope of work. (T.T. 113 & 116). To this end, Rolin entered into a "not-to-exceed" subcontract (dated May 10, 2017) with Dixie to perform that work based on T&M (time and material) rate plus 20% (*see* Plaintiff's Trial Exhibit 6 (subcontract between Rolin and Dixie)) after principals with Rolin, Dixie and Wind Clan reached an oral agreement and understanding that the work Dixie performed and each invoice Dixie produced would generate "a deductive change order to Wind Clan for that dollar amount." (*Compare* T.T. 113 *with* Plaintiff's Trial Exhibit 49). This understanding was a component of Wind Clan's oral agreement with Rolin (T.T. 218-19) to complete the exterior scope of work contemplated in the original subcontract with the hope being that

---

[29]   This Court **REJECTS** Plaintiff's argument that Wind Clan should be estopped from arguing that the written subcontract was not the express contract under which the parties were operating at all times because after Wind Clan's May 5, 2017 termination (and termination of the written subcontract) the parties entered into an oral contract whereby Rolin offered Wind Clan the opportunity to remain on the project and complete the outside scope of work. Wind Clan accepted this offer in the hopes that there would be monies remaining for it to be paid (out of the original total of $2,098,277.00) after payment of all owner paid materials and for work performed by Dixie and with knowledge that their agreement to perform would mean that Rolin would not file a claim on its (Wind Clan's) bond. The fact that Wind Clan ultimately waived its right to a jury trial does not amount to an admission that the written contract is the sole contract which informs the disposition of this case, particularly in light of this Court's specific determination that the parties relationship from May 8-9, 2017 forward was based on the express oral contract.

there would be monies left over at the end of the project from the contracted price

($2,098,277.00) after Rolin paid Dixie (*see* T.T. 360-63; *see also, e.g.,* T.T. 362-65

(Wind Clan reached the understanding regarding Dixie's interior work, as well as the

oral agreement with Rolin to continue the exterior scope of work because of Rolin's

threat to file a claim on Wind Clan's bond)). The sole provisions of Wind Clan's oral

contract with Rolin to continue with the exterior scope of work on the CYDC project and

to have Dixie's work deducted from the overall contract price Wind Clan negotiated with

Rolin are as set forth above and that oral contract was not modified at all until Wind

Clan and Rolin agreed at the end of July of 2017 that Wind Clan would take back over

the interior portions of the work and salvage whatever money that was left in the project.

(*See* T.T. 215-16, 279, 296 & 410). In other words, the oral agreement eliminated Article

10 and there were certainly no provisions regarding the recovery of attorneys' fees.[30]

The relationship between Rolin and Wind Clan under their express oral

agreements proceeded well from early May until early October of 2017, when the

relationship started to sour once again. Wind Clan continued even so to work on the

CYDC project throughout October and into the mid-November timeframe, but Wind Clan

did not return to the CYDC project following the architect's walkthrough on November

20, 2017 to perform the owner/architect punch-list work (*see, e.g.,* T.T. 133, 419, 446 &

843), a copy of which it received on November 28, 2017 (*see* Plaintiff's Trial Exhibit

93)). The Court finds therefore that Wind Clan breached its May 8 or 9, 2017, oral

contract with Rolin (as modified, again orally, in late July of 2017) to complete all

---

[30]     The Court **REJECTS** any suggestion by Rolin that the original subcontract
between it and Wind Clan was ever reinstated; it was not.

exterior and interior framing, including the owner/architect punch list, when it failed to return to the CYDC jobsite and complete its punch list items. *See Capmark Bank v. RGR, LLC,* 81 So.3d 1258, 1267 (Ala. 2011) ("In order to recover on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages."). For its part, Wind Clan does not dispute the existence of a valid oral contract binding the parties[31] and the Court does not find any evidence that Rolin failed to perform under the oral contract.[32] Wind Clan's breach of the oral contract requires the Court to consider damages Rolin could recover.

In reaching a decision on damages, the Court first turns to the monies properly offset against the original contract price of $2,098,277.00, excluding the $120,600.00 that Rolin improperly failed to pay Wind Clan for Wind Clan's acceptable work performed to the date of its termination on May 5, 2017. So, the Court begins with $1,977,677.00 and immediately offsets the total amount of the first three deductive change orders Wind Clan signed and approved for work Dixie performed through July 1, 2017. This amount totals $870,097.67 and reduces the "contract total" to $1,107,579.33. And though Wind Clan thereafter did not approve any Rolin change orders—that is, Change Orders 4-9—whether additive or deductive—the undersigned finds from a

---

[31]    The law in Alabama is clear that "[n]o contract, whether express or implied-in-fact, is formed 'without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract.'" *Mantiply v. Mantiply,* 951 So.2d 638, 656 (Ala. 2006), quoting *Steiger v. Huntsville City Bd. of Educ.,* 653 So.2d 975, 978 (Ala. 1995). Here, the Court finds that the oral agreement(s) between Wind Clan and Rolin meet these requirements.

[32]    Instead, any failure to perform by Rolin relates to the written subcontract agreement and Rolin's failure to pay Wind Clan for acceptable work it performed as of the termination for convenience of the written subcontract as a whole.

preponderance of the evidence that part of the oral contract between Rolin and Wind

Clan on May 8-9, 2017 included the agreement that any work invoice Dixie produced

would generate a deductive change order to Wind Clan for that dollar amount. Change

Order 5 for $302,940.62 further reduces the "contract total" to $804,638.71. Because

Wind Clan presumably has no problem with Change Order 4, as it is an additive change

order in the amount of $2,500.00 (Plaintiff's Trial Exhibit 10), the "contract total"

increases to $807,138.71. Change Orders 6 through 9 are all deductive change orders.

Rolin generated Change Order 6, in the amount of $5,000, on November 29, 2017, due

to Wind Clan's failure to install Bird Spikes and Change Order 9, in the amount of

$2,119.00, on March 13, 2018, for work done to change "multipurpose room walls from

F6 to B2 wall types." Wind Clan directed no specific objections to these two change

orders and the Court finds these change orders reasonable and specifically attributable

to Wind Clan's scope of work under the oral contract(s); therefore, the amount of these

change orders are chargeable to Wind Clan and further reduce the "contract total" to

$800,019.71. Rolin generated Change Order 7, in the amount of $232,598.00, on

January 12, 2018, and it relates to the acoustical ceiling tiles and wall panels installed

by Dixie.  The amount of this change order was part of the $2,098,277.00 subcontract

price between Rolin and Wind Clan and reflects the exact amount of the subcontract

between Wind Clan and Dixie for the performance of this work. Change Order 7 falls

within the scope of Rolin and Wind Clan's oral agreement that any work performed by

Dixie would generate a deductive change order to Wind Clan for that dollar amount, and

thus Wind Clan has no credible argument that this amount should not be deducted from

the already reduced contract total. Therefore, deducting the $232,598.00 further reduces the "contract total" to $567,421.71.

This leaves Rolin's February 26, 2018 Change Order 8, in the amount of $113,792.05 ($86,202.54 for work performed by Willard Rogers and $27,589.51 for work performed by Rolin) for work performed to complete the punch list. (*Compare* T.T. 143 *with* Plaintiff's trial Exhibit 105). Given, however, that Plaintiff's claim for damages sought in this lawsuit also seeks recovery of the same amount for the same work performed by Willard Rogers ($86,202.54) and a different amount for the same work performed by Rolin (that is, the lesser amount of $25,089.51[33]) (*see* Doc. 1), and allowance of both Change Order 8 and the claim for monies in Plaintiff's Exhibit 1 would be a double recovery, the Court **DISALLOWS** any "offset" for Change Order 8 and will consider the amounts in Plaintiff's Trial Exhibit 1 for Rolin direct costs and Willard Rogers costs related to punch list items.

A total of $567,421.71 remains. However, this Court must subtract from this amount Wind Clan's owner-paid materials in the amount of $552,370.79, leaving a total of **$15,050.92.**

The Court must now turn to the damages Plaintiff otherwise seeks in this case, as generally outlined in the attachment to Smith's February 15, 2018 letter to Wind Clan and as explained during trial (*compare* Plaintiff's Trial Exhibit 1 *with* T.T. 506-07 & 537-53), as follows: (1) direct costs to Rolin—fuel, materials and tools purchased by Rolin for Wind Clan to keep the subcontractor going forward on the CYDC project and to pay

---

[33]     Based on the testimony at trial, this lesser amount increased such that Rolin is seeking direct costs to complete punch lists in the total of $39,453.00. (*See* T.T. 538-40).

subcontractors to complete Wind Clan's punch lists—totaling $39,453.00;  (2) $86,202.54 paid by Rolin to Willard Rogers to correct Wind Clan's drywall work (to get it to level 4) and, once corrected, to repaint the drywall work; (3) $76,439.00 paid to Bagby & Russell for delays and purported overtime it paid to its employees to make up for the delays in the schedule caused by Wind Clan, as well as an additional $25,600.00 Rolin paid to Bagby & Russell for damaged work, where Wind Clan ripped out Bagby's work in order to make corrections to Wind Clan work thereby requiring B&R to come back and replace its previous work;  and (4) Rolin delay cost, which it calculated as four months of general conditions totaling $223,616.25.

As for direct costs, there were various invoices admitted at trial (*compare* Plaintiff's Trial Exhibit 123 *with* T.T. 538-39) upon which Rolin relies to establish its entitlement to a total of $39,453.00 (*see* Plaintiff's Trial Exhibit 123, at 2-43). And while this Court believes Rolin is entitled to reimbursement for the monies it expended on fuel, tools and items it purchased for Wind Clan during the course of the CYDC construction project and for certain out-of-pocket expenses it incurred in completing punch list items and correcting Wind Clan's work (*see* T.T. 538) it is unclear, based on the evidence supplied at trial, whether any portion of the $39,453.00 Rolin seeks in direct costs are connected to those costs Rolin agreed to "eat" during the November 14, 2017 contractor/subcontractor meeting, those costs being: (1) costs associated with creating a Level 5 finish at the building's front entry and associated corridor/hall (that is, the atrium area); (2) costs associated with rework required for the round lights; and (3) costs associated with finishing work around the speakers. Therefore, this Court **AWARDS** Rolin direct costs totaling $39,453.00 but at the same time specifically

**ORDERS** that if this total includes any of the three categories of costs listed above that Rolin agreed to eat, the total award for direct costs to Rolin will be that lesser amount to which counsel for the parties can agree.

Wind Clan does not dispute that Rolin paid $86,202.54 to Willard Rogers to correct Wind Clan's drywall work (to get it to level 4) and, once corrected, to repaint the drywall work; instead, the Defendant stakes the position that these costs are not its responsibility because the painter proceeded with the painting and thereby accepted the surface and conditions of the drywall. The Court, however, disagrees with Wind Clan in this regard and, in so doing, specifically relies on the trial testimony of the architect Dieter Borrell that Wind Clan was responsible in the first instance to ensure that the drywall was at a level four finish, and on the trial testimony of Seth Smith that while the specifications prepared by the architect did say application of coating by the painter indicates acceptance of surface and conditions, those specifications also instruct the painter simply to verify that the finishing compound is sanded smooth and not justify whether it is a level three or four finish. Accordingly, this Court finds that Wind Clan's failure to ensure a level four finish and refusal to perform punch list items required Rolin to hire Willard Rogers to correct Wind Clan's drywall work in order to get the drywall to a level four finish and then repaint the drywall; therefore, Wind Clan is **ORDERED** to pay Rolin damages totaling $86,202.54 for completion of this work.

The final elements of damages Rolin seeks are its delay costs, which it calculated as four months of general conditions totaling $223,616.25, as well as the $76,439.00 Plaintiff paid to Bagby & Russell for delays, and purported overtime it paid to its employees to make up for the delays in the schedule caused by Wind Clan, as

well as an additional $25,600.00 Rolin paid to Bagby & Russell for damaged work, where Wind Clan ripped out their work in order to make corrections to Wind Clan work and thereby required Bagby & Russell to come back and replace its previous work. And while this Court will **ORDER** Wind Clan to pay to Rolin the $25,600.00, the Court specifically **DECLINES**, for the reasons set out below, to order Wind Clan to pay to Rolin the purported delay costs it incurred or the purported delay and concomitant overtime costs incurred by Bagby & Russell.

The Court finds that Rolin's conclusion and calculation that Wind Clan caused a four-month delay in the project is baseless and unreliable. To arrive at four-months, Smith simply took the April 5, 2017 iteration of the schedule,[34] which set out a substantial completion date of August 30, 2017, then allowed Wind Clan two months—to the end of October—to reach final completion, and finally charged Wind Clan as delay November 1, 2017 through February 26, 2018 (a period of almost four months), the date Rolin demobilized from the site. This rigid approach, however, fails as a method to calculate delay attributable to any of nearly 30 subcontractors on the CYDC construction project. The Court heard several times during the trial that no construction project finishes on time, certainly not a project of the complexity of the instant one. The Court also heard that a construction schedule is a living and breathing document subject to change, such that the most accurate representation of what is going on in the

---

[34]    Smith testified that he took this schedule because this is the schedule that Wind Clan bought into. This statement is actually much too generous and favorable to Rolin as the evidence at trial reflects confusion in this regard, with Wind Clan believing that Rolin, through Smith, had agreed to Wind Clan's suggested changes to the schedule, which would have placed E before A&B, and the like.

field are the daily logs and other day to day records.[35] One of the crucial things that Smith's approach fails to take into account is the fact that from May 8 or 9, 2017 through to early October of 2017, Rolin made no official complaint about Wind Clan delaying the project (*see* Plaintiff's Trial Exhibit 76 (only showing the generation of very brief emails in early July the subject of which was the need for Wind Clan to remove materials— excess metal studs—from the site, with only one of those emails directed to the removal of materials also referencing flashing missing and waterproofing not complete and the need for a Hardie schedule from Wind Clan)) and certainly gave no indication that Wind Clan was solely at fault for the failure to meet the substantial completion date of August 30, 2017 set forth in the April 5, 2017 schedule. Rather, the evidence is to the contrary and establishes that the April 5, 2017 schedule had been extended to a late-October substantial completion date. (*See* Plaintiff's Exhibit 81 ("Please respond in writing, confirming Wind Clan will finish the project ***based on the current schedule*** and work through the weekends as required. ***The project is 25 days from completion, and since returning to finish the project, Wind Clan [h]as performed very well***.")). In addition, Smith's approach fails to account for Change Order 2 between Rolin and the Owner, which increased the contract time by 112 days, such that the date of Substantial Completion became ***December 16, 2017.*** (Plaintiff's Trial Exhibit 121; *see also id.* ("Time extensions due to weather delays (+67) and due to added scopes of work affecting the job schedule (+45) for the period from October 2016 through November

---

[35]     It is no surprise, then, that Defendant's expert, John Buziak, testified that he did not hear in Smith's testimony any supportable calculation to attribute a four-month delay in the CYDC project to Wind Clan. (*See* T.T. 641-42).

2017.")).[36] As well, Stephanie Rolin's trial testimony that the Architect's written specifications on the CYDC project defined substantial completion as what is normally regarded in the industry as final completion (T.T. 564-66), if taken as true, would mean that final completion was effectively "accomplished" on December 29, 2017, the date Rolin obtained the certificate of substantial completion. The Court credits and agrees with Kelli Williams' testimony that all delay after November 20, 2017 would be concurrent delay.

In light of the foregoing, and even ignoring the testimony of Wind Clan's expert that Wind Clan's work was not on the critical path,[37] the Court cannot find that a four-month delay in the project is attributable to Wind Clan; therefore, this Court **DECLINES** to **ORDER** that Wind Clan pay to Rolin its purported delay costs totaling $223,616.25 or that Wind Clan reimburse the purported delay and concomitant overtime costs incurred by Bagby & Russell ($76,439.00) and paid by Rolin to Bagby and Russell.

1.    <u>**Total Damages Due and Owing Rolin from Wind Clan**</u>. In light of the foregoing discussion, the Court **ORDERS** Wind Clan to pay to Rolin as damages for its breach of the May 8 or 9, 2017 oral contract between the two parties, the following: (a) direct costs totaling **$39,453.00**, **less** any monies in this total attributable to work that Rolin specifically agreed to "eat" during the November 14, 2017 subcontractor meeting,

---

[36]    These 112 days are telling but do not reflect the full scope of delays in the project, particularly given the evidence of record from the November 14, 2017 meeting between Rolin and all of its subcontractors that the electrician had been waiting for three months for the architect/owner to get back with him regarding a change order he had submitted.

[37]    The Court does not agree with Mr. Buziak's testimony that the exterior framing was never on the critical path, for the reasons previously identified, but Rolin did not prove by a preponderance of the evidence that a four-month delay in the project is attributable to Wind Clan.

as set forth above; (b) the **$86,202.54** Rolin paid to Willard Rogers to correct Wind

Clan's drywall work (to get it to level 4) and, once corrected, to repaint the drywall work;

and (c) the **$25,600.00** Rolin paid to Bagby & Russell for replacing its (B&R's) previous

work that Wind Clan ripped out to make corrections to Wind Clan work. These are the

only damages due and owing Rolin from Wind Clan based upon Wind Clan's breach of

the oral contract it had with Rolin following the May 5, 2017 termination for convenience

of the whole of the February 13, 2017 written subcontract executed by the parties. The

Court finds that nothing that occurred between the parties after they entered into their

oral contract on May 8/9, 2017 (and, as modified in late July of 2017) in any manner

reinstated any of the provisions of the written subcontract and, as a result, this Court

**will not** entertain any motion by Plaintiff that it be awarded attorneys' fees in

accordance with the terms of the written subcontract.[38]

     **D.**    **Wind Clan's Counterclaim Counts Asserted Against Rolin.**  Wind

Clan's counterclaim against Rolin and its surety Hartford Fire Insurance Company, sets

out the following six counts: (1) Rolin's failure to make timely payments to Wind Clan

under Alabama's Prompt Pay Act, Ala.Code § 8-29-1, *et seq.*; (2) breach of the

subcontract by Rolin for failing to pay Wind Clan for work and materials provided on the

project by Wind Clan in accordance with the terms of that subcontract; (3) Rolin owes

Wind Clan for work and labor done for Rolin by Wind Clan at Rolin's request; (4)

conversion by Rolin of Wind Clan's tools and equipment; (5) a request for entry of

declaratory judgment, asking that an order for accounting be issued to declare the rights

---

[38] Rolin had not engaged attorneys and, therefore, had not incurred any attorneys' fees at the time it terminated Wind Clan on May 5, 2017.

of the parties in a determination of the amount of money owed by Rolin to Wind Clan; and (6) a claim against Rolin for unjust enrichment. At the conclusion of the evidence in this case, as memorialized by previous Order (Doc. 68) and separate Judgment (Doc. 69), the Court granted Rolin's Rule 52(c) motion for judgment on partial findings as to Wind Clan's conversion count (Doc. 68, at 2) and entered judgment in favor of Rolin and against Wind Clan on Wind Clan's conversion counterclaim (Doc. 69). Accordingly, the Court gives no further consideration to Wind Clan's conversion claim and turns to the remaining five counts of the Defendant's counterclaim.

       1.      **Prompt Pay Act Claim**.  Wind Clan's claim under Alabama's Prompt Pay Act relates to the three pay applications it submitted to Rolin—on February 8, 2017 ($85,500.00), March 27, 2017 ($65,700.00), and April 30, 2017 ($149,400.00)—which Rolin, in turn, submitted to the Owner. Rolin received payment from the Owner on those pay applications but paid nothing to Wind Clan. (*See* Doc. 59, at 5).

       The Alabama Prompt Pay Act enables a "contractor, subcontractor, or sub-subcontractor [to] file a civil action solely against the party contractually obligated for the payment of the amount claimed to recover the amount due[.]" Ala.Code § 8-29-6. Under the Act, Wind Clan constitutes a "subcontractor," *see* Ala.Code § 8-29-1(6) (defining subcontractor), because it furnished labor to Rolin and performed labor in connection with a contract to improve, *see* Ala.Code § 8-29-1(2) & (3) (defining "improve" and "improvement"), real property, *see* Ala.Code § 8-29-1 (defining real property) in connection with the building of the Child and Youth Development Center on tribal lands of the Poarch Band of Creek Indians and Rolin clearly constitutes a contractor under the Act, *see* Ala.Code § 8-29-1(1) (defining contractor), because it was awarded a contract

by the Poarch Band of Creek Indians (the Owner) to construct the CYDC, *see* Ala.Code § 8-29-1(4) (defining owner).

Alabama's Prompt Pay Act provides that performance by a subcontractor in accordance with the provisions of its contract entitles it "to payment from the party with whom [it] contract[s]." Ala.Code § 8-29-2. The Act also provides that a paying party may withhold payment on certain enumerated grounds (if there is a bona fide dispute), including unsatisfactory job progress and defective construction not remedied. *See* Ala.Code § 8-29-4(a)(1) & (2). The Act requires that any contractor or subcontractor who disputes the payment it owes to provide written notification within five days of the "disputed request for payment or notice of disputed request for payment." Ala.Code § 8-29-4(b).

Rolin concedes that it received payment from the Owner but did not pay Wind Clan's three pay applications. Nevertheless, Rolin denies that it owes Wind Clan the disputed total of the pay applications (or any portion thereof) because of the defective quality of Wind Clan's construction and the otherwise unsatisfactory job progress.[39] While no evidence exists to indicate Rolin provided any written notice of dispute to Wind Clan within the timeframe allotted under the Prompt Pay Act, the Plaintiff has provided a plethora of evidence of a lack of performance by Wind Clan in accordance with the provisions of its subcontract (that is, defective construction and unsatisfactory job progress). Therefore, although this Court finds that Rolin technically violated the Prompt Pay Act by failing to give Wind Clan the required written notice of its intention to

---

[39]    The Court **REJECTS** any continued argument by Rolin that Alabama's Prompt Pay Act does not apply to the CYDC project and the parties' contract for the reasons previously articulated. (*See* Doc. 53; *compare id. with* Doc. 52).

withhold payment, it must **DENY** Wind Clan's claim under the Act because Wind Clan's performance was simply not in accordance with the provisions of its subcontract with Rolin. *See Otis Elevator Co. v. W.G. Yates & Sons Constr. Co.,* 2016 WL 826731, *6 (N.D. Ala. Mar. 3, 2016) (citing § 8-29-2 and finding that even in those instances where a contractor fails to give the required written notice of its intention to withhold payment and thereby violates the Act, a subcontractor's claim under the Act can still be denied where its performance was not in accordance with the provisions of its contract with the contractor).[40]

      **2.**     **Breach of Subcontract**.  Given the termination for convenience finding, and given that Wind Clan did comply with the implicit contract requirement that it submit pay applications to Rolin for work performed, Rolin was required to compensate Wind Clan for any "acceptable Work performed to the date of termination," provided Rolin received payment for Wind Clan's work from the Owner. Here, of course, the Owner paid Rolin for Wind Clan's work performed to the date of termination, as reflected in Wind Clan's first three pay applications to Rolin totaling $300,600.00, and ultimately Rolin did accept some work attributable to Wind Clan but only after that work was corrected by Dixie. Based on the evidence offered at trial, the Court has determined that the value of Wind Clan's acceptable work to the date of termination, when offset for the rework of Dixie, totals $120,600. This Court now determines that Rolin breached the express terms of the Subcontract it had with Wind Clan by not paying to Wind Clan the

---

[40]     This Court does not find this Prompt Pay Act determination to be at odds with its earlier determination regarding the value of Wind Clan's work ultimately "accepted" by Rolin. The earlier determination rests on Rolin's improper termination of Wind Clan for default under Article Ten of the written subcontract and, instead, the conclusion that the termination was one of convenience.

value of Wind Clan's acceptable work (that is, $120,600). However, even assuming that this Court has improperly determined that Rolin breached the subcontract in this regard, it would still determine that Wind Clan would be entitled to be compensated by Rolin in the amount of $120,600.00 because Rolin's May 5, 2017 termination of Wind Clan was a termination for convenience of the whole of the contract, requiring Rolin to compensate Wind Clan for the "acceptable Work performed" to the date of termination.

3.    **Claim for Work and Labor Done.**  "Under Alabama law, a claim for work and labor done sounds in quantum meruit, a quasi-contract cause of action. In order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that it had a reasonable expectation of compensation for its services." *Bates v. MPW Industrial Service, Inc.,* 2008 WL 11380187, *2 (N.D. Ala. Oct. 20, 2008), citing *Utah Foam Prods., Inc. v. Polytec, Inc.,* 584 So.2d 1345, 1350 (Ala. 1991); *see Hendrix, Mohr & Yardley, Inc. v. City of Daphne,* 359 So.2d 792, 796 (Ala. 1978) (recognizing that a work and labor done claim is a quasi-contractual theory of recovery). Alabama law is also clear that "[w]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." *Brannan & Guy, P.C. v. City of Montgomery,* 828 So.2d 914, 921 (Ala. 2002). In other words, "[t]he existence of an express contract on a given subject generally excludes an implied agreement on the same subject." *Mantiply v. Mantiply, supra,* 951 So.2d at 656 (citation omitted).

Here, there are two express agreements reached between the parties, the written subcontract agreement (Plaintiff's Exhibit 32) and, upon the May 5, 2017 termination of the agreement, the May 8-9, 2017 oral agreement reached by the parties (the scope of which was later modified by further oral agreement at the end of July). Because of the

existence of these express agreements covering the parties' dealings, there is "no need to imply an agreement between them to ward off inequitable results." *White v. Microsoft Corp.,* 454 F.Supp.2d 1118, 1133 (S.D. Ala. 2006). As a result, therefore, where, as here, Wind Clan has brought claims sounding in both express contract and quasi-contract as to the same subject matter, "Alabama courts have deemed the quasi-contract claim not to be cognizable." *Id.; see also Gunter v. Chase Bank USA, N.A.,* 731 F.Supp.2d 1238, 1248 (S.D. Ala. 2010) ("Plaintiffs cannot proceed under the dual theories of 1) a breach o[f] an oral or a written contract and 2) breach of an implied contract."); *Mantiply, supra,* 951 So.2d at 656.  Accordingly, Wind Clan's claim for work and labor done is not cognizable in this action.

       **4.**    **Unjust Enrichment.**   "To succeed on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Flying J. Fish Farm v. Peoples Bank of Greensboro,* 12 So.3d 1185, 1193 (Ala. 2008) (internal quotation marks, emphasis, and citations omitted); *see also id.* ("The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another."). More to the point, "[t]o prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.,* 77 So.3d 139, 145 (Ala. 2011) (internal quotation marks and citations omitted).

64

Because unjust enrichment is an equitable remedy, it "issues only where there is no adequate remedy at law." *Univalor Trust, SA v. Columbia Petroleum, LLC,* 315 F.R.D. 374, 382 (S.D. Ala. 2016); *Blackmon v. Renasant Bank,* 232 So.3d 224, 229 n.4 (Ala. 2017) (quoting *Univalor*); *see also Northern Assurance Co. of America v. Bayside Marine Constr., Inc.,* 2009 WL 151023, *4 (S.D. Ala. Jan. 21, 2009) ("Alabama law makes clear that unjust enrichment is an equitable remedy only to be invoked where there is no available remedy at law."). Stated somewhat differently, breach of contract and unjust enrichment are mutually exclusive when both claims are based on the same facts and contract. *Blackmon, supra,* 232 So.3d at 229 n.4.; *see also Sellew v. Terminix International Co., LP,* 2020 WL 1083148, *13 (N.D. Ala. Mar. 6, 2020) ("The Alabama Supreme Court has recognized that an unjust enrichment claim and a breach of contract claim are mutually exclusive, if both are based on the same facts and the same contract."). Thus, a plaintiff may not recover under an equitable claim for unjust enrichment where there is an explicit contract which has been performed.  *See Blackmon, supra,* 232 So.3d at 229 n.4.; *see also Whatley v. Ohio Nat'l Life Ins. Co.,* 2019 WL 6173500, *8 (M.D. Ala. Nov. 19, 2019) ("Typically, 'unjust enrichment claims may be pled in the alternative to a breach of contract claim when the existence of a contract is in dispute.' However, 'a plaintiff may not recover under a theory of unjust enrichment when an express contract covers the same subject.'").

Here, Wind Clan's unjust enrichment claim is based on the same set of facts and covers the same subject as its breach of subcontract claim (*compare, e.g.,* Doc. 59, at 6 *with id.* at 7-8); therefore, Wind Clan has no cognizable cause of action for unjust enrichment because of the express contract between the parties. *See Wells Fargo*

*Bank, N.A. v. Trotman,* 940 F.Supp.2d 1359, 1369 (M.D. Ala. 2013).[41]  Besides, even if

an unjust enrichment claim is cognizable, the Court finds that Wind Clan has failed to

produce sufficient evidence to rise to the level of unjust enrichment.[42]

       **5.**      **Wind Clan's Claim Against Hartford on the Payment Bond.**  With

respect to this claim, and because this Court is **ORDERING** Rolin to pay to Wind Clan

damages totaling **$135,650.92**, Hartford is undoubtedly responsible for this amount

under its payment bond with Rolin. However, with respect to the actual amount

contained in the affidavit attached to the bond claim submitted to Hartford by Wind Clan,

the Court agrees with Rolin that Wind Clan failed to establish that the surety improperly

rejected Wind Clan's bond claim. Indeed, based on the evidence presented at trial it is

clear that the affidavit in support of the bond claim contained an incorrect contract price,

a price well in excess of the agreed contract price; therefore, Rolin's surety properly

denied Wind Clan's bond claim—in the amount of $2,527,161.51—on March 14, 2018.

Now, however, Rolin and Hartford can mutually decide who should pay Wind Clan the

$135,650.92.

## CONCLUSION

      For the reasons set forth above, the Court **ORDERS** Wind Clan pay to Rolin, as

damages for its breach of the May 8 or 9, 2017 oral contract between the two parties,

---

[41]      And even assuming Wind Clan's unjust enrichment claim extends "beyond" the three pay applications, for the same reasons as stated earlier regarding Wind Clan's work and labor done claim, the unjust enrichment claim is not cognizable because of the express oral contract between the parties.

[42]      Wind Clan's request for entry of a declaratory judgment, asking that an order for accounting be issued to declare the rights of the parties in a determination of the amount of money owed by Rolin to Wind Clan, is **DENIED**. As set forth above, the Court has determined the amount of money Rolin owes to Wind Clan to be $135,650.92.

the following: (1) direct costs totaling **$39,453.00**, **less** any monies in this total attributable to work that Rolin specifically agreed to "eat" during the November 14, 2017 subcontractor meeting, as set forth above; (2) the **$86,202.54** Rolin paid to Willard Rogers to correct Wind Clan's drywall work (to get it to level 4) and, once corrected, to repaint the drywall work; and (3) the **$25,600.00** Rolin paid to Bagby & Russell for replacing its (B&R's) previous work that Wind Clan ripped out to make corrections to Wind Clan work.

Rolin is conversely **ORDERED** to pay to Wind Clan **$120,600.00** under the written subcontract for the reasons previously articulated, as well as the **$15,050.92** remaining out of the contract price after making all proper deductions. The parties can, of course, agree to offset the $15,050.92 against any damages due and owing Rolin. Judgment will be entered separately and will be immediately appealable as this Court will entertain no motions for reimbursement of attorneys' fees and costs.

**DONE** and **ORDERED** this 24thᵗ day of April, 2020.

  s/P. Bradley Murray
**UNITED STATES MAGISTRATE JUDGE**